Jones, C. J.
This was an action by the plaintiffs, as endorsees of a joint and several promissory note for $15,000, payable months afterdate, to the'order of Keeler & Rogers, at the Fulton Bank, against the defendant, one of the makers of the note. It was an accommodation note, made by the defendant and others, at the request of Keeler & Rogers, for. the sole purpose of relieving that house from the immediate pressure of pecuniary difficulties, which threatened to overwhelm them. This note, with another similar note for $5,000, having the same time to run, created by the samé makers, at the same time, and for the same purpose with the note in suit, were negotiated by Keeler, to the Hudson Insurance Company,—an incorporated company deriving its powers.and operating under a charter granted by the legislature of the state of New-York,—and by that company the larger note • for $15,000, now in suit, was transferred to the Fulton Bank, the present plaintiffs.
The defence to the plaintiffs’ right to'recover upon the note, was opened, as resting upon these two general grounds : first, that the note was usurious and void; and secondly, that the discount of it by the Hudson Insurance Company, and its subsequent transfer from that company to the plaintiffs, were in violation of the statutory provisions of the law of the state, usually denominated the restraining act; or if not in contravention of that statute, were unauthorized by the act of incorporation of the Hudson Insurance Company, and was in either case illegal, and the note for that reason inoperative and void asra security in the hands of the Hudson Insurance Company; and that the plaintiffs being, as they are alleged to be, chargeable with notice, at the time of the transfer to them, of the' previous history of the note, no action could be sustained upon it by them.
The course taken at the trial, for the support on the one side, and the refutation on the other, of these general grounds of defence, gave rise to other questions, chiefly questions of evidence, , which, so far as they may be material to a correct understanding of the views I have taken of the merits of the defence, will be noticed in their order. First then, was the defence of usury sufficiently sustained by admissible evidence to preclude or bar the plaintiffs’ right of recovery upon the note t The witness called *510 by the defendant to prove the fact of usury was James Keeler, one of the payees and endorsers of the note. His competency was called in question by the plaintiffs, who objected to him on the n ^ ' , . . , ground that a party whose name is upon negotiable paper, and who has contributed to its circulation, as a good and available security, shall not be afterwards allowed to testify as a witness in subversion of its validity by proving that it was, in point of fact, polluted with usury at the time he gave it the sanction of his name; but the objection was overruled, and I think correctly.
The question of the competency of a party to .negotiable paper to prove it usurious in its origin, has undergone much discussion, and received different determinations at different times, wholly irreconcileable with each other. In this state the leaning of the courts was for many years strongly against the competency of the witness, under such circumstances, to testify, and during that period,"the current of decisions took that direction; yet the question was still treated as unsettled. But after floating for some time in uncertainty, it has finally been settled by our Supreme Court, that a party to negotiable paper, who is not disqualified by interest, may testify to facts which" show the note to which he has given the sanction of his name to be polluted by the taint of usury. Thus in the case of Waters v. Powell, [17 John. 176.] that court held, that a party to a negotiable note may be permitted to testify to any facts arising subsequently to his becoming a party to the note, which does not involve his own turpitude, and if the note receives its taint when it is negotiated to the party xvho discounts or otherwise acquires it by the facts then happening,'the witness would be atliberty to disclose those contaminating facts."
The distinction taken by the decision in this case, between the corrupt agreement, which enters into and pollutes the note in its original concoction, and the taint it may receive in its negotiation after it is perfected as a security, to the party who discounts it, may be supposed to reconcile the principle of the decision, with the rule previously insisted upon as the law of the court. .But in the more recent case of the Bank of Utica v. Hilliard, [5 Cowen 153.] that distinction was disregarded, and it was broadly ruled by the court, that the maker of a negotiable note was an admissible witness to prove that the note was originally given for a usu- *511 nous consideration : and so long as these decisions remain in force, the rule must be considered as settled in favor of the competency of the witness.
But another objection was taken to Keeler as a witness, on the ground of interest. To sustain this objection, the plaintiffs introduced the two assignments mentioned in the case, from Keeler & Rogers, and Keeler & Mather, by which the whole of the property of the assignors was assigned to trustees to secure their creditors, who, with the exception of the makers of the $50,000 note, were arranged into two classes (the one preferred to the other) for the payment of their debts, the assignors reserving to themselves the residue, if any there should be. The first assignment was of part of the property for the exclusive benefit of the makers of the note for $50,000, and the second assignment gave that note the preference to both classes of their creditors. And-it appeared, and was admitted, that the note in question was one of the debts secured by the assignment, and -entitled to the preference given to the note for $50,000, which was to be first paid. On these facts the plaintiffs insisted that Keeler was interested in the event of the suit. To obviate the force of the objection, the defendant offered to prove that the whole of the property covered by the assignment was insufficient to pay the first class ’of creditors by $40,000. This evidence was rejected, and an exception taken to the opinion of the judge on the point. The defendant then offered a release from Keeler, acknowledged in open court, granting and releasing to the trustees named in the assignment, all his interest in the assigned property, and in the residue reserved to the assignors. The counsel for the plaintiffs still insisted on their objection to his competency, on the ground that his interest could not be released ; but the judge was of opinio.n that he was admissible, and overruled the objection. To this opinion, the counsel for the plaintiffs excepted ; and our next inquiry in order, will be, whether the exception taken by the defendant to the decision of the judge against the relevancy of the testimony offered by him, or that taken by the plaintiffs to the admission of the witness, upon his release to the trustees, can be sustained,
*512 First, was the proof offered by the defendant, that the property embraced in the assignments was insufficient to satisfy the first °f creditors sufficient or material to show that the witness had no interest by reason of the residuary trust 1 It is difficult to conceive how the answer to this question* considering the course the cause took, can be material to the defendant: for the witness released his interest in the residuary trust, and. was on that ground admitted to testify. The defendant has had the full benefit of his evidence; and the notion, that the credit of the witness suffered by the imputation of an interest, to which the Court gave its countenance, by requiring a release to extinguish it, appears to me too refined and unsubstantial to form the basis of a judicial decision. And even if the Judge erred in excluding the proof, and thereby sustaining an objection to the witness which that proof would obviate, yet the objection being removed by other evidence, and the witness admitted to testify, the error became harmless, and it would be against the settled rules of the Court to disturb the verdict for that cause. But the Judge was right; for the testimony offered by the defendant did hot obviate the objection. It might, have shown in a striking point of view • the apparently remote and illusory prospect of a residuary fund, and the seemingly forlorn hope of benefit to the witness from that source ; and from these premises, a cogent argument might have been drawn against the probable influence of such a valueless and mere nominal interest upon the witness to swerve him from the truth. But the fact of the interest, such as it was, would still remain. It was a direct interest in a fund which was contemplated as possible, at least, to exist, and which the witness himselfihad reserved as a substantial or expected benefit, we are to presume, to him. The general rule of evidence is to exclude a witness having a direct interest in the event of the suit, as incompetent, without regard (except in special and peculiar cases) to the value and importance of that interest to the witness; and this case does not come within any exception to the rule. We are not at liberty to speculate'upon the influence which a greater or less degree of interest might have upon the witness. It is sufficient to exclude him that he has a direct interest which may be available to him.
*513 Here the objection to the witness was the interest he had in the contingent residue of the trust funds reserved to the assignors, which his testimony tended to disencumber of the charge of tire note in question". The assignments were sufficient prima facie evidence of the residuary interest of the witness in the trust-premises, to disqualify him until the objection was removed. The most obvious and effectual course was to extinguish that apparent interest by release. It would be dangerous, and withal most inconvenient in practice, to allow the party calling the witness to repel the evidence of interest resulting from the assignments which are his own acts," and speak his own language, by an exposition of the property and debts embraced in the deeds, and proofs, and estimates of the values of that property, in order to ascertain the probable results of the trusts, and the chances of a surplus. Such an ordeal for testing the interest of a witness in a surplus fund, would partake too much of an ex parte inquiry to be consistent with even-handed justice. It would, moreover, be open in every stage of it to exception, and lead to interminable and vexatious controversies, and it would seldom end in any satisfactory result. The items composing the stock in trade, which mercantile houses, on the eve of insolvency, assign for the security and benefit of. those they wish to favour, usually consist of merchandise more or less unsaleable, and outstanding demands against debtors of different degrees of responsibility. The actual values and probable avails of such items, seem to be mere matters of opinion, and with the exception perhaps of flagrant cases, approaching to fraud, the estimates of them will seldom be satisfactory or sufficiently certain to exclude all chance of a surplus in every possible turn of events.
This may be a strong case ; but even in this case, the sources from whence the residuary fund was to flow, had not been exhausted. The assigned property was still in the hands of the trustees, and desperate as the defendant represents the hope of a surplus to be, the witness may have been under very different impressions. It is not unusual for the insolvent, who is familiar with the property he assigns, and too apt to be sanguine in his hopes and expectations of favourable dispositions and avails, to retain *514 his confidence in the full payment of the debts he secures, long after his trustees and creditors have lost all hope of satisfaction from trust estate. Yet the insolvent, if he believes in the sufficiency 0f the fund to yield him a surplus, will be governed by that supposed interest, as being a real and substantial benefit to him.
Rut again: why resort to an argumentative refutation of the charge of interest from the'inadequacy of the fund, or the insufficiency of sources to create it, when a far more simple, direct, and satisfactory answer would be given by the release of the witness on the stand 1 When a witness is called to testify, and the tendency of the evidence will be to create, disencumber, or increase a fund of which he may be entitled to partake, it must be conceded that the best and most satisfactory answer to the objection to him on that ground, is a release of his interest in the fund. It effectually extinguishes all possibility of benefit to him from that source, and silences all his hopes and pretensions, whether well or ill founded, to any present or future advantages to himself from the result of the fund, in any possible turn of events or change of circumstances. And it seems to me to follow, from this acknowledged operation of the release, which it is always in the power of the witness to give, that the defendant, who showed no obstacle in the way of attaining it, was bound, if in his power, to produce such a release from this witness, and could not substitute for it the proof he offered. It is manifest that he had the power to produce the release, for in the sequel he did produce it. Yet he chose to put himself upon the weak ground of an offer of proof to show a deficiency of the assigned premises to satisfy the debts, as conclusive against all possible interest in the witness.
The considerations to which I have referred, satisfy me that the resort to that species of proof to repel the charge of interest, was inadmissible. It was an argumentative and inconclusive answer to the objection, substituted without necessity, for the more efficacious and decisive refutation by the release of the witness; and the proof, moreover, which was offered, however clear and convincing it might be to others, could not divest the witness of any interest or possibility of interest he might have, or suppose and believe himself to have, in the trust estate under the residuary *515 trust in his favour, and the consequent avoidance of the note in question, as a charge upon that estate. These interests, real imaginary, would be reached by the general release of the witness himself, and could not be otherwise extinguished. The exception of the defendant to the exclusion of the proof he offered, is of course untenable.
But, secondly: Did the release itself fully restore the witness to competency to testify, or were the plaintiffs still well founded in the objection to which they adhered % The object and operation of the release was to restore the competency of the witness, by removing all temptation to diminish the debts, for the purpose of increasing the residuary fund in which he was to participate. It did extinguish all the interest he could possibly have in any such residuary fund, and so far it operated to remove the objection to his competency. Itdid not exonerate him from his liability to the plaintiffs as endorser of the note in question. But his engagements, as endorser, did not expose him to the objection of interest; for the endorser is not answerable over to the makers of the note in case of a recovery against them; and if his testimony should defeat the suit of the holders against the makers, the record in that suit would not be evidence for him in a subsequent action against himself; and the holders in such subsequent action (his oath no longer standing in the way) would recover against him, unless he could establish the usury by other proof. But this was an accommodation note, created by the makers at the request and for the accommodation of Keeler & Rogers, the endorsers, and negotiate ed by them for their own benefit. It was to be paid by them. They, by their assignment, recognised it as a debt of their own; acknowledged their obligation to pay it, and made provision for such payment. They stand, therefore, as regards liabilities between them and the defendant, on the footing of makers, and the testimony of Keeler tends directly to the discharge of a debt which he was bound to provide for and to pay. He was bound to defend the makers of the note in the suit of the holders upon it, and to indemnify them against its results. He would consequently be answerable over to the defendants in an action adapted to the case, for the amount of the recovery against him, in the event of *516 the ultimate success of the plaintiffs in the suit; and from that liaas regards the cost at least, his own testimony is to shield him. The verdict which his oath would secure to the defendant would not operate to discharge the note, nor be an available defence for him in an action upon it by the holders against him. The holders, in their suit against him, would recover simply the amount of the note with interest; but the recovery over of the defendant, after a verdict against him by the holders, would subject the witness to the costs also of the previous suit against the original defendant. From these costs, his own evidence in this suit undeniably had a direct tendency to protect him. His release to his assignees could not reach that ground of interest, and if it be such as the law will regard as substantia], it must disqualify him. If, therefore, the objection taken at the trial to his continuing interest, was upon that ground, and was sufficiently pointed and explicit, he ought to have been freed from that badge of interest, or to have been excluded; and if improperly admitted to testify, his evidence ought not to be allowed its weight in the scale against the plaintiffs’ verdict.
But the objection to the competency of the witness, after his release to bis assignees, was general and indefinite, and the reason assigned for it was, that his interest could not be released. Could such an objection be fairly understood to refer to his liability to the costs of the suit? Did it either expressly or Implicitly point to that liability as the ground on which it rested 1 And if that liability was the interest to which the plaintiffs intended to object, was not the cause they assigned for their ob- ■ jection delusive and calculated to mislead? was the liability to the costs of the suit, an interest which could not be released ? The witness was offered by the defendant, in whom alone the right to the remedy over for the costs of the suit against him resided, and he might surely have extinguished that right by a release, or by a suitable covenant and indemnity, if a formal release would, from any cause, be ineffectual against any resort or recourse by the defendant, in the event of judgment against him, to the witness for the costs of the suit. And if, therefore, the responsibility of the witness for thpge costs, in an action against him by the defendant, *517 was the true ground of the continuing interest, to which the obiection was intended to applj-, it might have been removed, and if had been disclosed at the trial, would most probably have been obviated. Howthen could the plaintiffs,if they referred to that liability as the ground for persisting in the objection, be warranted in representing it as an interest which could not be released? It was in the power of the defendant himself to discharge the witness from it, and as he seems to have supposed that his defence rested solely upon the testimony of that witness, he could not have hesitated to exercise the power he possessed to remove the impediment, if aware of its existence, which obstructed his competence to testify, and if in fairness the plaintiffs were bound to disclose the true ground of their objection at the trial, and to apprise the defendant that the ulterior responsibility of the witness to the defendant for the costs of the suit was the continuing" interest to which he objected. As he withheld the disclosure at the trial "where the objection might have been obviated, it may be questionable whether he ought to be permitted to avail himself of the benefit of the exception here, I state it, however, as an open question upon the whole objection of incompetency, by reason of liability for costs : and as the views I have taken of the general merits of the application before us for a new trial, render that question of minor importance in this cause, I shall forbear to express any decided opi-~ nion upon those points I conceive it to present, and to which I have thus fully adverted.
But if the testimony of Keeler was properly admitted, does it prove the fact of usury t the substance of his evidence bearing upon the question, was that his co-partnership being pressed by pecuniary embarrassment which threatened to overwhelm them, Benedict the defendant, and other customers and friends of their establishment, agreed to aid them, with a credit of §50,000, to enable them to raise the funds their necessities required. That application was made by him (Keeler, who was one of the directors) to the Fulton Bank for a loan upon this credit, by the discount of a note for $50,000, payable in twelve months at the Fulton Bank, to be drawn by the parties who were to befriend him, in favor of Keeler & Rogers, and to be negotiated by them *518 for their use and accommodation, and that to provide for the inimediate wants of the house, a further application was at the same time -made by him to the board of directors, for a temporary advance until the note for $50,000, should be obtained, for which advance, two notes, one for $15,000, and the other for 10,000, then laid before the board, signed by some of the parties who were to be the makers of the note for $50,000, were offered as collateral security. That the board of directors appeared favourable to the loan, but not disposed to act upon the matter that day; that he (Keeler) represented to them that his house must have an immediate advance of money to save them from the necessity of stopping their payments. He does not inform us what reply, or whether any reply was made by the board to this appeal; but he observes that Mark Spencer a co-director of the bank, and then the president of the Hudson Insurance Company, who was present at the time, signified to him privately, that he (Spencer) would furnish the money the house of Keeler & Rogers might want for that day, and told him that the Hudson Insurance Company would take $20,000, of the loan applied for by him at the bank, if he would take one half of it in the bonds of that company. That those bonds were at that time at 4~ per cent, below par. That Keeler objected to the proposition, that it would cost too much, but offered to take $5000, in bonds. That he afterwards proposed to Spencer, that if the lenders would furnish him with $14,000 in cash, he would take the residue, $6000, in bonds, to which proposition Spencer acceded. And it was, thereupon agreed between them, that $20,000, of the proposed loan of $50,000, should be taken by the Hudson Insurance Company, that $14,000, should be advanced by the lenders in money, and the residue, $6000, be taken in the bonds of that company at par. That in pursuance of this agreement, $14,000, was advanced to him, (Keeler) and he deposited with Spencer the two notes which had been offered to the bank, and which were to be left with him until the loan for $50,000, should be consummated. That after the note for $50,000, had been obtained, the application to the bank, for the discount of it was declined; but that the loan of the Hudson Insurance Company was, nevertheless, con *519 tinued, and the note for $50,000, having been exchanged for other notes of smaller amount, but with the same parties for makers and endorsers, two of the smaller notes, one for $15,000, being the note now in suit, and the other for $5000, were substituted for the notes for $25000, temporarily deposited with Spencer on receiving the advance of 14,000, as aforesaid, and were received and accepted by Spencer as the stipulated security for the loan of $20,000, from the company to Keeler, and the two notes temporarily deposited with him, given up and cancelled. Keeler further stated that he, on the 29th October, called at the office of the Hudson Company to complete the business and receive the bonds for the balance of the loan, but that Spencer said that they were not then made out. The house of Keeler & Rogers stopped payment the same day, and it does not appear that any bonds ever were issued or delivered to them or to Keeler, for the balance of the loan.
The usury then, which infected this loan, if it was usurious, consisted in this feature of the agreement, that $6000, of the consideration was to be taken in bonds, at par, which were at that time, at 4J- per cent, below par in the market; and if we are to take for granted, (the case being silent on this point,) that the discount, or interest at the customary rate was deducted from the notes for $20,000, for the twelve months they had to run, and that the 4; per cent, upon the bonds, was in addition to the regular discount of the notes, there would be a semblance of usury in the transaction. But if the defence of usury had rested upon that circumstance alone, I should hesitate to sustain it; because I feel the force of the answer to the objection, and cannot well see how the Hudson Insurance Company are to be charged with usury on that ground, since their bonds carried interest, and they were bound to pay the full amount of them and could not profit by the discount at which they were sold in the money market. The borrower, if he must turn the bonds into money, will lose the discount, and by that operation receive less than a purely cash loan would give him. But how do the lenders benefit by that operation? They pay the full consideration for the notes they discount in money, and their own bonds at par carrying interest. *520 In what sense can they be understood to exact or receive more than at the. rate of legal interest for the use and forbearance of I°an thfey make % If the agreement to take the bonds, was merely nominal, and the real contract had béen that this discount of 41 per cent, should be returned by the lenders, and the full proceeds of the bonds after that deduction paid to the borrowers, instead of the delivery to them of the bonds; or if the company was in the habit of purchasing up the bonds they issued, at the market price, and such purchases and sales were to be effected at the office of the coippany, and that operation was understood to make part of their course of dealing; and if it was averred in general terms that such purchases and sales were to be effected at the office of the company, these considerations might peradventure give to the agreement a different aspect from that which it now wears. But of this there is no evidence in the case. If, therefore, the fact of usury had b.een left upon the testimony of Keeler, I should strongly incline to coincide with the jury in their verdict against the defence on that ground. I observe, however, that the counsel for the defendant inquired of this witness what was understood by the parties, as to the arrangement to take $6,000, in the bonds of the company ; and insisted that the question was proper, inasmuch as, the taking of bonds by previous dealings, and similar transactions might have acquired a conventional meaning. The plaintiffs objected to the question, and the. Judge sustained the objection.
It was certainly competent to the defendant to prove by this witness the agreement under which notes were discounted, or the joan upon them contracted. And if in settling and adjusting that agreement between them, reference was had to any general regulation or course of dealing for the rates of discount, or ofinterest to be charged to the borrowers; and the witness, by his own previous knowledge on an explanation at the time, was apprised of the terms, which such regulation or course of dealing would prescribe, and gave them his assent, they became a part of the contract and were capable, of proof by the witness. He was fully examined to the agreement, and if the defendant was not satisfied with his explanations, he had it in his power to pursue the *521 enquiry* But the question to which the plaintiffs objected, did not point to the agreement or any fact or circumstance within the knowledge of the witness. It enquired of him, in substance, what the parties understood by the arrangement for taking bonds for the six thousand dollars of the loan; and upon the supposition that the question was pointed to this particular loan, the parties intended by it must have been the witness himself and Spencer. But the witness had already testified to his own exposition and understanding of the arrangenent, and had affirmed it to be, that the bonds which were at 4 1-2 per cent, below par in the market, were to be taken by the borrowers at par. The question could not be expected to draw from him any other answer; and if he had sworn to a different understanding, or ascribed a meaning to the terms of the arrangement relative to the bonds, inconsistent with the sense of them admitted by his previous examination, he would have discredited his own evidence, and have shown himself unworthy of belief.
As respects his understanding, therefore, the question was unnecessary; still if it had been put to him in legal form, and the nature and real terms of the arrangement made the subject of inquiry, instead of his understanding of what the arrangement was, it might have been admissible, and though superfluous, not improper. But it went further, and inquired of the witness what Spencer’s understanding of the arrangement was, which clearly transcended the bounds of legal evidence. The witness might testify to the agreement made by Spencer with him, and the terms of the loan as settled between them; but he could not testify to the understanding of Spencer not embodied in the agreement, nor made part of it, as to the arrangement between them relative to the bonds; for he could have no knowledge of any such understanding, otherwise than by the information of Spencer : and it must be conceded, that he could not testify to the point upon that representation. Indeed, it would be difficult upon any acknowledged rule of evidence, to sanction the interrogatory or to permit it to be answered. The words it would profess to interpret, are perfectly intelligible, and express a clear, distinct, and rational meaning, in all respects well suited to the arrange *522 ment to which the witness applied them, and entirely consistent with the tenor of his general testimony. He obviously used ^iem in their ordinary sense, to explain the terms of the loan as agreed upon between Spencer and himself. The grievance he complained of, was the loss his house must sustain by the sale of the bonds he was to take at par, which were at the time at 4 1-2 per cent, below par in the market; hence his objection that the loan, if the half was to.be paid in bonds, would cost too much. He knew that the necessities of his house must force the bonds immediately into market for sale, and he was of course desirous, in negotiating the loan, to reduce the amount of bonds he was to take. There is no intimation in any part of his testimony of any other dissatisfaction with the terms of the loan, or of any hidden or secret condition or usurious contract covered by the arrangement for talcing the bonds. There is no room, therefore, for explanatory proof of the meaning of the phrase.
But the defendant insists that the question was proper, because the words might, by previous dealings and similar transactions between the parties, have acquired a conventional meaning, and the case of Astor v. The United Insurance Company, [7 Cowen, 202.] is cited to show that where words in any trade or business have acquired a specific meaning, parol evidence may be introduced to show what that meaning is. That case was decided upon the doctrine of the usage of trade, and the point decided was, that the phrase, “ usage of trade,” applies in respect to that class of merchants who deal in the article. Words by known usage of trade, or by long and habitual use of them, in a peculiar sense, by any particular class of men, do acquire a technical or specific meaning peculiar to the class who use them in that sense, and differing from the ordinary acceptation of them by the public at large. And in such cases parol evidence is, from necessity, admissible whenever they are used in the technical or peculiar sense, to prove the fact of the usage, or habitual use of the words in such peculiar sense of them, and the specific meaning they have thereby acquired. But this is not a case of usage, or of words acquiring a specific meaning by the long and habitual use of them by any class of merchants or traders in a sense peculiar to themselves. It *523 is indeed vindicated as an analogous case, supported by the same principle. But what just analogy is there between them] The specific meaning ascribed by the defendant to these words, is by his own admission confined to the Hudson Insurance Company and its dealers, and he traces back its origin no further than the commencement of the monied operations of that institution.
The defendant himself does not claim for the phrase any specific meaning as impressed upon it by usage, or long and habitual use of it, in a sense peculiar to itself. It is a conventional meaning that the words are alleged to have acquired. What are we to understand by the conventional meaning of words! Must it not be the meaning which the parties who use them, mutually agree, for reasons of their own, to affix to them, as the sense in which, in dealings between themselves, they are to be understood ! How then does a convention between the lender and borrower of money differ from an agreement between them as to the terms of the loan, or the phraseology by which those terms shall be expressed or signified! And to charge or affect these borrowers with a signification of words materially differing from their ordinary and popular sense, as being the conventional meaning of them, must they not be parties to the convention by which that peculiar and unusual meaning was affixed to those words ] Or if the peculiar signification ascribed to them has been acquired by the long, uniform, and habitual use of them by the lenders in the negotiation of their loans with their customers, must not the borrower be first charged upon proper evidence, with knowledge or notice of that peculiar signification of the words employed in describing the arrangement, before he can be held to have contracted his loan in reference to it, or to havé given any consent, express or implied, to the terms which the words, when used in such peculiar meaning of them, would import or signify ! If so, any conventional meaning the words in question may have acquired, which could have any bearing upon the terms of the loan, must have resulted from an agreement between the immediate parties to the contract, or from the assent of the borrowers to the terms and rates of discount and loans established by the company, in their dealings as lenders, and fully known or explained to the *524 borrowers at the time, as the regulation, to which they were to conform.
The conventional meaning of the phrase, “ taking of bonds,” according to the .defendant’s exposition of it, was acquired by the practice of the Hudson Insurance Company, and in its course of ¿ealing; and a broad and most artificial signification is ascribed to it. The words are alleged to signify, that in all loans by that company, the bonds of the'company are to be taken by the borrower instead of money, and that a discount of six per cent, is to be deducted from the whole nominal amount of the bonds, and the borrower is also to be charged with a life insurance at a premium of six per cent, upon the sum borrowed: a signification purely artificial, and entirely foreign from the natural meaning of the phrase, and indicating terms of the loan which the words could by no possible construction be made to express; and which borrowers, not possessed of the key to the secret conventional meaning of them, would not understand them to imply. And, admitting that the Hudson Insurance Company had established a system of rates and terms of discounts and loans, upon which, in their course of dealing, as lenders of money, they acted and required others to observe, and which the phrase in question was understood by them and their regular dealers to signify, must not those facts be known or explained to the applicant, and the rates •and terms of the loan required by the course of dealing of the lenders, receive the assent of the borrower, to make the arrangement and the signification of the words employed to express it, conventional between them and binding upon him? These facts, then, and the terms upon which the notes were negotiated to the insurance company, were the material points to which the defendant,—especially upon the direct examination- of his own witness,—was, by the rules of evidence, to apply his interrogatories, to.elicit the truth of the transaction which he professes to have, had in view.
But the question put. to the witness was, what the parties (referring to himself and Spencer,) understood by the arrangement for taking the $6000, in bonds: and it was insisted upon as a proper question, on the ground that those words might, by *525 former transactions of a similar character, between the parties, A have acquit ed a conventional meaning, which the defendant ought to bt, permit .--i to show. This was the principal question upon which the Judge passed. Now it seems to me, that a preliminary objection occurs to this course of inquiry, which was decisive against its admissibility. It was not shown that there had been any former transaction of a similar character, or any previous dealings whatever between those parties, nor was the witness interrogated to that point. The question put to him could not even be regarded as the first link in a chain of proof to establish the terms of the loan, which the phraseology of the arrangement between the parties is said to indicate. Keeler was the only witness, v. ho had been examined, and his testimony up to the time that this question was propounded, and indeed throughout, was confined to the single negotiation, in which this loan originated. The foundation, therefore, on which the defendant builds his right to interrogate the witness to the conventional meaning of the words in question, was not so laid as to authorize the step he proposed to take. There could be- no previously settled conventional meaning of words between parties, who had never had occasion to employ them in any monied operation before. The defendant, before he could be entitled to an answer to his question, was bound, upon his own principles, to establish the fact of former similar transactions, or previous dealings, by which the words used by the witness could have acquired the conventional meaning, which he was required to testify.
But if in point of fact the words in question had, and were known to the witness to have, the signification ascribed to them by the defendant, and he, with such knowledge, contracted in reference to that signification of them, then the agreement he entered into with the company was in conformity with the terms which-these words in that special or peculiar meaning of them imported. Arid he was subject to a direct examination to the point, and must have answered to proper interrogatories, as to the actual agreement "as it was finally arranged, and in fact subsisted between tl tem. His own knowledge on this subject and the real and true nature and terms of the contract, and actual *526 rates of the discount or loan he effected, however disguised, and. whatever token, artifice or device may have been employed to conceal and cloak them, he was bound to disclose. He might have been subjected to the scrutiny of a strict examination and the most searching interrogatories, to elicit from him the truth. But the rules of evidence required that the enquiry should be directed to the developement of the facts and circumstances of the case, and the terms of the arrangement and agreement for the discount of the notes, and the disposition to be made of the residue beyond the advance upon them. And I am satisfied, from the views I have taken of the question put to the witness, enquiring into the understanding of the parties, as to the arrangement for taking the $6000, in bonds, that it was not admissible, and was properly overruled.
The arrangement, as explained by Keeler, was a simple operation of discount, on terms not unfavourable to the borrower unless the condition of the $6000, made them so; but the words employed in describing that arrangement, as expounded by the defendant, unfold to us new and different terms of a most grave and impressive character. None of these harsh conditions appear in the arrangement or agreement as described by Keeler. He not only observes an unbroken silence touching them, but so far as he was examined to the point, he denies and disproves \ that they enter into or qualify the contract. Before the objectionable question was proposed, he had stated that when he applied for the bonds for the $6000, nothing was mentioned about life-insurance, and after that question had been overruled, upon his further examination, he testified in answer probably to a more direct and pointed question, that nothing had been said up to the time of the failure of his house, (which was after all negotiation was at an end,) about a life-insurance. He positively affirms too, that $14,000, was advanced upon the two notes in money, and the residue or $6000 only, of the amount, left to be paid in bonds;—features of an agreement entirely dissimilar from those which would belong to the arrangement which the supposed conventional meaning of the phrase in question would signify. Could the witness be under a mistake as to the terms *527 of his agreement or have forgotten them 1 His memory might have been refreshed by proper and pertinent interrogations to circumstances which occurred at the time, and the exactions or demands actually made of him as the price of the advance or loan upon the notes.
But the witness, if he had ever been apprised of the alleged conventional meaning of the words he used, and was fully aware of the special contract they are affirmed to have signified, could not have foi'gotten the circumstance, nor have been under any misapprehension of the bearing and practical operation of the agreement. With his attention specially directed to the cost of the loan he was negotiating, and his solicitude to lessen the amount he was to receive in bonds;—the twelve per cent, discount, and a life insurance must have made too deep an impression upon his mind for so short a lapse of time to efface or obscure. It is not probable that with security of such high order as he had to offer he would accept a loan upon such grossly ruinous terms, or if driven by his necessities into the measure, the fact could not have escaped his recollection, and he could have had no sufficient inducement intentionally to suppress or conceal (especially upon his examination on oath) the circumstance of the extortionate discount exacted from him. But it does not appear that any premium for a life insurance was ever exacted of him, or that any claim was ever preferred or suggested by the lenders to any such item, as part of the price of the loan. And the entire omission of the witness to notice those extravagant terms, which the words in question are alleged to signify, and his express denial of any mention of a life insurance, at any stage of the treaty for the loan, and the absence of all proof of any exaction, demand, or claim by the lenders from him of those oppressive rates of discount, compel me to conclude, that he did not understandingly contract in reference to any course of dealing which would subject him to such onerous conditions. If so, the usual course of dealing established by the company in regard to their discounts and loans, must have been dispensed with on that occasion by Spencer, their agent; and the agreement between Spencer and Keeler, must have been an exception to the general practice pf *528 the company, and the terms of it settled by the parties themselves. . And such is the character given of it by Spencer, when he comes to testify. He does not pretend that those notes were to be dis- " r , counted at the rates, or upon the terms ordinarily exacted by the company; or that bonds were to be taken by the borrowers instead of money for the amount of any premium charged them for life insurance. On the contrary, he virtually excludes all such pretensions by the account he gives of the operation; for he agrees with Keeler, that the sum of $14,000, was by the terms of the agreement between them, to be advanced in money. And the points on which they differ chiefly refer to the $6000, residue of the notes upon which the advance was made.
Spencer too, is equally silent with Keeler as to any conventional meaning acquired by the words in question. He states the course of dealing and mode of transacting business in reference to discounts and loans at the office of the company, and admits, in substance, that loans were paid in bonds of the company, and that six per cent, of the amount of the bonds, and á premium of six per cent, for a life insurance, never.intended to be effected, were required of the borrowers in cash at the time, and as the terms of thé discount or loan. But he speaks of no conventional meaning of any particular "phrase or words to signify or indicate those terms to borrowers. He proves that Keeler was a dealer of the company, and had previously contracted other debts to them, by the discount of bills and notes at the rates required by them in their ordinary course of dealing. But the whole tenor of his testimony goes to shew that the arrangement between him and Keeler, relative to those notes was not brought within the pale of the general practice of the company, and had no reference to the course of dealing, for the terms or conditions of the advance or loan upon them; but that it was an independent agreement for the discount and loan in question, upon terms negotiated and agreed upon between themselves. •
• Why, then, does not the testimony of. Spencer furnish all the information and discovery which the question excluded by the Judge could, in its widest range, have elicited from Keeler % If so, a new trial to let in the further examination Of Keeler, would *529 be useless and vain. I have been led into more extensive views of the bearings of this excluded question, and the disclosure avowed on the argument, as the object of it, than the vindication of the decision of the Judge might seem to call for; as well from the. consideration that the evidence of Spencer on the subject, appeared to me, when collated, so fully to meet the professed objects of the inquiry, as to supersede the necessity of that inquiry altogether, and thus obviate the force of the defendant’s objection, as from the impression and belief also, that other matters of material bearing upon the defence of usury could be advantageously noticed and explained in that mode of treating the subject,
Spencer was obviously the most competent witness to testify to the practice and course of dealing of his own company, and the peculiar signification any words might have acquired by that practice and course of dealing; and the deep-rooted aversion, which the defendant in the sequel of the trial discovered, to the introduction of Spencer as a witness, is the only assignable reason why he should resort to the secondary, and at least questionable species of evidence, he offered to prove those matters: when Spencer himself, who was the president of the company, and the immediate party to this arrangement with Keeler, and who was present in court, must have been familiar with the facts, if they existed, and must have known, moreover, how far Keeler contracted with notice of those facts, and in reference to any settled rates and terms of discount by the company. He must have had cogent reasons for his course, and must either have distrusted Spencer’s integrity, or the sufficiency of his own evidence—if drawn from the best and highest sources—of the facts he wished to prove, or he could not have preferred to abide by Keeler’s evidence, as the case represents it, rather than call a witness who was fully possessed of personal knowledge of the whole matter. The testimony of Keeler certainly was not satisfactory, and it would, I think, have been difficult to prevail upon judicious and impartial men to make >t the basis of a verdict ajrmst the purity of the notes, and in avoidance of the plaintiffs’ demand. But my views of this testimony would seem not to agree with the opinion respecting it of either of the parties to the suit. They both attached *530 to it the weight and importance of decisive proof. The defendant so impressed with its conclusive force as prima facie evidence at least °f the fact of usury, that he rested his defence upon it alone f and the plaintiffs viewed it with such apprehensions of danger, that after vigorous but unsuccessful struggles to exclude the witness, they called Spencer to discredit him and disprove his statements. Spencer’s account of the arrangement with Keeler, as we have already seen, varies materially from the statements of Keeler; and on some points they are in direct collision. Spencer, for example, is positive that nothing was said about bonds or interest, and that no part of the loan was to be made in bonds:—a statement utterly at variance and wholly irrecoucileable with the testimony of Keeler, who makes it the prominent feature of the arrangement, that $6000 of that loan was; in effect, forced upon him reluctantly in bonds at par, which, at the time, were 41 per cent, below par in the market. But Spencer represents that it was a part of the agreement, that if the advance of $14,000 was not repaid, and the house of Keeler & Rogers did not go on with their business, then the notes were to remain as security for any further claim, which the company had or might have upon that firm. But all the-pre-existing claims of the company were upon usurious discounts; and it was upon this appropriation of the notes ia question, to secure those tainted demands, that they received their contamination. If, then, Spencer is to be believed, his testimony establishes the defence Keeler was called to prove. Spencer was introduced by the plaintiffs to correct the errors of "Keeler, and to give the genuine and accurate version of the agreement which Keeler was charged with having mis-stated. He was assailed by the defendant as an adverse witness to him, and a witness, whose credibility it was iris interest to impeach and destroy ; upon those principles the parties acted, and much of the time of the court appears to have been consumed in attacks upon, and defences of, the credit and character of that witness, the defendant producing all the proofs in his power to discredit him, and the plaintiffs putting forth their whole strength to sustain him.
It turns out, that his disclosures on the stand have made him in effect the witness of the defendant, and arrayed him in hostilily *531 with the plaintiffs’ demands. He has unfolded a system of operations by the Hudson Insurance Company in the discount hills, and the loaning of money upon negotiable paper, which was confessedly illicit and indefensible. And his testimony shows, that the notes in question were, by the terms of the arrangement concerning them, devoted not only to the reimbursement of the advance upon them, but to the protection also of debts usuriously contracted under that system of operations ; and they received from this preconcerted, and in part, as I conceive, illicit appropriation of them, a taint of the usury with which those debts were imbued. It can no longer be the interest, of the defendant, therefore, to urge his objections to the credit of the witness ; and the plaintiffs cannot repudiate him, nor disclaim the history of the transactions, which he has given them. It was competent to them to have shown, that lie was under a mistake, or had been incorrect in his statements: but they offered no evidence to explain or correct his testimony. They, on the contrary, insisted upon its verity, and called a witness to corroborate him, who confirmed his statements, as to the terms of the loan, and the agreement with Keeler, which composed the material points of his evidence, on the question of usury.
There is certainly a discrepancy between the statements of Keeler and of Spencer relative to the residue of the notes beyond the advance upon them. But the plaintiffs would resort, with ill grace, to a witness, they denounced as incompetent to testify, (and against whose whole examination they object) for proof to outweigh the evidence of their own witness. And if, as they insist, his testimony is to be objected to, or laid out of view, and the verdict left to stand upon that of Spencer, the embarrassment, if any, which would result from the discrepancies between them, would necessarily disappear. But if both are held to be competent and credible witnesses, the "evidence of Cunningham, must give the preponderance to Spencer. Cunningham is wholly unimpeached. The agreement between Keeler and Spencer was made in his presence, and he is full, clear, and posi= live in his statements as to the terms of the loan, and the agreement between the contracting parties. And on these important *532 points, he in all respects corroborates Spencer. But I pass by exceptions taken to the credit of Spencer, and the evidence in support, of them, without further comment; as well for the reasons a ready ags¡gned, as upon the ground also, that the decision of the Judge upon the. question of usury, to which the material evidence of the witness applied, entirely superseded all necessity or use ot any discussion of the weight of evidence or credibility of witnesses.
The jury, I am bound to presume, were guided by his opin. ion and direction, and came to the conclusion they did, against the defence of usury, without examining or deciding upon the credit of the witness. The Judge decided, and he instructed the jury, that if in point of fact the note in controversy was taken in part to secure usurious paper, still that circumstance did not make it void. This, it is true, was explained by the Judge, at the time, to he a mere formal decision made by him for' the purpose of bringing up the question for the consideration of the court, and not intended to express any deliberate opinion of his own upon the point; yet the influence of it upon the jury was the same as the settled opinion of his honor would have been. They were told, that in judgment of law, a note taken to secure usurious paper, was not for that reason void. The jury under such a decision, if they acted discreetly, would, as a matter of course, find against the usury, and the validity of their verdict must depend upon the correctness of the rule of law given them by the Judge for their guidance. And as that, rule of law was, in my judgment, erroneous, I should be unable, whatever might be my viervs of the evidence in support of the facts, to sustain the verdict. Upon the same grounds we might decline to express an opinion upon the proposed inquiry into the usual terms of loaning in the Hudson Insurance office in reference to the compensation taken for loans. That inquiry was defended as allowable and proper for testing the accuracy of Spencer’s memory as to the terms of the loan in question. But if the Judge w'as correct in tli.e position he assumed, that the facts were undisputed, and the point in controversy reduced to a question of law, any inquiry instituted to test the accuracy of Spencer’s memory, ¡roust be regarded as immaterial, because inapplicable to this *533 branch of the defence, and immaterial as respects the usuiy, on which the defendant relies.
But there are other reasons against, its admission for any purpose. And first, it is irrelevant; for the true point of inquiry, as respects those parties, was the terms of this particular loan, which might be in conformity to the general practice of the lenders, or might deviate from their usual terms, and be arranged by special agreement between the immediate parties to this particular contract. And secondly, the witness did, in the course of his cross-examination, in fact answer the question, by disclosing the course of dealing and practice of that company in their loans of money, and the usual rates of compensation and terms of the loans taken of them; and he superadded, that the practice and course of dealing to which he thus testified, was the usual mode of transacting the business, and was rarely departed from : a disclosure, which must, I think, be acknowledged to have fully satisfied the inquiry in its broadest requisitions.
I express no opinion upon the form or substance of the interrogatories proper to be put to a witness, who is examined to the character of another witness, or upon the right of the impeaching witness to take his own knowledge into the account, in forming his opinion as to the credit of the witness he comes to impeach. And upon the much litigated question of the competency of an objecting party to examine to general character—without limiting his questions to the points of truth and veracity—and upon the correlative question also, whether—if testimony to general character without such restriction be admissible, and the opinion of the witness is unfavorable, and he assigns a cause for believing the character of the witness he impeaches to be bad—an inquiry is proper, into the origin and source •of that opinion, and as to the solidity of the grounds, upon which he professes to found it, in order to enable the jury to estimate them correctly: I also refrain from expressing my opinion, because those questions, whatever might be the decision of them, could hot (as regards this particular branch of the defence of usury, in the turn given to that defence by the Judge) be relevant, or have any material bearing upon the present, application. The opinions *534 expressed by the Judge upon the evidence, and his directions to the jury, had the effect virtually to withdraw from them all con^deration of the facts—upon which the charge of usury now under consideration was founded—as not being in dispute, and to place that branch of the defence exclusively upon a point of law, which he, at the same time, decided against the defendant. It would be a waste of time to discuss questions of evidence in the face of that decision; for the principle of it is, that the facts in evidence, (admitting them to be true,) and presuming the note in controversy to have been taken in part, as a security for the payment of usurious debts of Keeler & Rogers to the company, do not impress the stain of usury upon the note itself, or avoid it as a valid security. Consequently that decision, if sustained, puts an end to that branch of the defence; and if erroneous, the error must first be corrected, and a new trial awarded, before these questions of evidence reserved for the opinion of the court, if material to the defendant, and determined in his favor, can be available to him.
But independently of the charge of the Judge, and upon the supposition that his decision is less absorbing of other points than I conceive it to be, still, none of the questions of evidence I have passed over, appear to me to affect the defence of usury, upon which I place my decision, in the views I take of the merits of that defence; for Spencer was admitted to testify, and proved the note in controversy to be infected by the taint of usury. The plaintiffs* by whom he was introduced, accredited, and defended, must admit him to be a credible witness. And if it should be conceded, that the defendant had the right to pursue the course of examination to credit, which was denied him, the redress for the injury, if any was sustained by him, would be a new trial; and to that redress the testimony of the witness, if admitted to be correct, and taken as true, will, as I understand the rules of law applicable to the case, entitle him. We must decide the principal question, upon the rule of law laid down by the Judge, which is directly in issue between the parties, and vitally affects the validity of the verdict: and as my opinion is clearly against the plaintiffs on that ground, an opinion upon those collateral points cannot be necessary.
*535 But another objection is taken to the verdict, which is equally fatal with that of usury. It is this, that the plaintiffs discounted the note for $ 14,000 only, and the recovery is of the whole amount of it with interest. This finding of the jury was also in conformity to the opinion and charge of the Judge, who decided that the plaintiffs, if entitled to recover at all, were entitled to recover the whole amount of the note, as the court could not look into or regard the rights of the cestui que trusts. To this part of the charge the defendant objects, because the plaintiffs were not restricted in their recovery, as he contends they ought to have been, to the $ 14,000 of the note discounted by them, with interest from the time it fell due; and the question is, whether they showed any right to recover beyond the amount of such discount. The plaintiffs justify their recovery of the full amount, upon the, ground that the title was vested in them as the holders and possessors of the note, which was an entire security for themselves, and those to whom the surplus interest in,it belonged, and that they were entitled to recover- that surplus interest as trustees for whomsoever might be the beneficial owners of it. But the defendant insists, that the party who limits his discount to a part only of a note, takes it in effect as a note for the amount, for which he discounts it, and that the ownership of the residue, which he declines to take, is left in the original holder, who offered it for discount, and remains subject to his disposition and control. And it is suggested, that when the reduction of the note itself is practicable, the course is actually to reduce it to the sum agreed to be discounted, by the substitution of a new note for that amount in its place; and where such reduction is not practicable—as in the case of business paper for example—a memorandum is accustomed to be made of the sum agreed to be discounted: but that, whether those precautions are taken or not, the fact of the discount of part only of the note, necessarily restricts the title and ownership of him, who makes the discount or purchase, to the part he discounts ;—the residue or rejected portion of it continuing absolutely vested in him, who offered it for discount.—And that an agreement is implied between the new party in interest and the original proprietor, whereby they become part owners in proportion to their *536 respective rights of aliquot parts of the note thus partially discounted: but that no part of the residue results to the discounter ®-om discount of the. part he consents to take, and the possession he necessarily acquires and retains of the note.—And that he would not be entitled to recover upon it, beyond the portion of it, which was discounted or purchased by'hitn, and could not inter-meddle with the residue, which he had refused to take, and had rejected.
What the precise effect of such a partial discount of a note may be, and what the-legal'and equitable rights and interests of the respective parties, who offer it for discount, and who discount it, in part, would be, in the several portions of it, and in the entire note;—and especially whether—in the eventof theinsolvency of all the parties to it, and the previous transfer in good faith of the undiscounted portion of "the noté to a purchaser for a full consideration, or the intervention of general assignees claiming title to that part of it, which the discounter déclined to take—the party, who discounted it in part, and is the holder of it, would be entitled to the security of the whole note for the repayment of the amount of his discount, and have a right to the dividends, on that principle, of the estates of the insolvent drawers and endorsers, until fully repaid his advances, with interest and costs of suit;—or whether he must be content with dividends upon the amount only, which he discounted, and leave the dividends upon the portion he refused to take on discounts for the use and benefit of the particular purchaser, or the general assignees, as the legal or beneficial owners pro tanto of the note—are questions, perhaps, of some delicacy, hut which it is not necessary for the purposes of this application to consider or decide.
Whatever the rights and interests of the discounter may. be, in cases of the insolvency of the parties to the note, and the consequent dishonor of the paper, and pursuit of his remedy by action, his demand, under any circumstances, against the makers, if discounted for them, could not exceed the amount of his advance, with interest and costs of suit; and upon the paynaent of that amount, he would be compellable, unless clothed with rights or equities to the surplus in it, on other grounds, *537 lo deliver up the note. In the present case, the note had been negotiated and passed to the Hudson insurance Company, was afterwards deposited by Spencer, the President of the Company, with the plaintiffs—by what authority, does not appear—as collateral security for a loan of $10,500, made to him on his own note at 60 days ; and we learn from Leavitt, the former President of the bank, that it was discounted by the bank upon his own application without the knowledge of Spencer: that Spencer was largely indebted to the bank at the time, and had agreed that any paper belonging to him, found there, should be held by the bank as security for his debts; and that the note in question was, in June, 1826, found in the Bank, and he, Leavitt, having been informed by Spencer, that $14,000 had been advanced upon it, caused it to be discounted for that sum, and the amount carried to the credit of Spencer.
Hence it appears, that the plaintiffs knew at the time they appropriated the nole to their oxvn use, that the sum of $14,000, and no more bad been advanced upon it by Spencer, who deposited it with them; and it was afterwards taken by them under the form of a discount, at the instance of the president, for that amount only, and Spencer credited xvith that sum as the avails realised for the discount of it by them. If, then, it be conceded, that lenders, who discount a note for part only of its amount, become trustees for those, xvho are interested with them in it, as to the surplus and residue of the note beyond the discount or loan upon it, that trust xvould enable the discounter, as holder, to recover of the maker—for the sole use of the endorsees or cestui que trusts, for xvhom it was discounted, to the extent only that the maker would be liable to those indorsees themselves—in an action by them directly against him upon the note; and he would be entitled to all the defence against the trustee, as to the residue of the note beyond the discount,'that he would have in an action against him by the cestui que trusts. Now it is in proof, and it is not denied, that the whole advance of the Hudson Insurance Company to Keeler upon the two notes they received of him, was $14,000, and no more. How could that company claim to recover of the de - fendant a larger sum 1 It. is true, that the loan contracted as *538 stated by Keeler, was $20,000, and that the two notes amounting together to thatsum, were negotiated and delivered to Spencer for the lenders, in the fulfilment of the terms of that contract; but upon the implied condition, surely, that the contract should be performed and the loan completed by them. Then, was the res¡¿ue anc¡ balance of $6,000 of the loan, or any portion; of it, or the notes given for it, recoverable by those lenders against this defendant^ The whole current of admissions and proofs on both sides, exhibits clear and decisive defences in every aspect of this branch of the case against such recovery. It is conceded that no part of this residue has ever been advanced or paid. Has any title been acquired to it, against the owners or indorsers of the note, which the plaintiffs can make available to themselves in this suit 1
The answer is found in the testimony of Keeler and Spencer Keeler testifies, that it was to be paid in bonds of the company at par; Spencer denies that any part of the loan was to be paid in bonds, but his explanation is, that the notes in the events that occurred, were to be held for the advance of $14,000, and the security and payment of other debts of Keeler & Rogers to the company: and the proof was clear, that all the other debts of that firm were for usurious loans made to them by the Hudson Insurance Company, by the discount, of notes and bills for their accommodation. Whether Keeler or Spencer is correct in the views thus given of the arrangement between them, the lenders, even if they could reclaim their advance, could have no legal or equitable right to any portion of this residue and surplus o: $6,000 beyond the advance; for if Keeler is right, the considera!ion tor the $6,000, of the loan,admitting it to be free from the taint of usury, has wholly failed by the neglect and virtual refusal of Spencer to deliver the bonds. And this being an arrangement between the immediate parties to the loan personally or by agent, and the notes being made for the accommodation of Keeler & Rogers, as the endorsers, and never negotiated or endorsed, and fully consummated by delivery—so as to make them available to the holders against the maker as operative securities, until the transfer of them to the company by Keeler under that arrangement-—thei'ewas no obstacle *539 to an inquiry into'the consideration of that negotiation of them as between the immediate parties to the arrangement. And the disclosure of that consideration, and proof of the total failure of it, showed the claim of the company or of Spencer to any part of those notes, or any interest in them beyond the advance of $14,000, to be unconscionable and unjust. And if Spencer’s account of the agreement be true, an equally conclusive defence is shown; for the residue of the notes beyond the advance, being, according to his statement, (by the express terms of the agreement under which they were taken) to be held and applied, in the events that occurred, for the security and payment of pre-existing usurious debts of Keeler & Rogers to the company, the notes were, as I apprehend, contaminated throughout by the taint of usury, which infected the debts they were to secure. Or, if the rules of law could safely indulge the actual advance upon the securities with an exemption from the operation of the principle,—no excuse could be offered for the residue or surplus amount of $6,000— devoted as it was exclusively to the furtherance of the fulfilment of the corrupt agreement—under which the previous debts were contracted, and to the security and payment of those usurious debts.
The Hudson Insurance Company, if any recovery at all could have been had by them, clearly could not have recovered in any action against this defendant, if properly defended, beyond the actual advance to Keeler, with interest. And neither that company nor Spencer, who was privy to the whole history of the notes, could transfer to .the plaintiffs, or vest in them any greater right or interest in the surplus beyond their advance, as trustees for their own benefit, than they themselves possessed at the time of the transfer; and it follows, as a necessary consequence, that the plaintiffs could not recover for the Insurance Company or for Spencer as cestui que trusts, what those cestui que trusts would not themselves be entitled to demand. The Judge erred, therefore, in charging the jury that the plaintiffs, if entitled to recover at all, were entitled to recover the whole amount of the note in controversy. I am satisfied that the objections against the verdict—-as improperly overruling the defence of usury, and fo? *540 that it exceeds in amount the interest of the plaintiffs in the note, and for the misdirection of the Judge to the jury, upon the ques’ which those objections involved—are decisive m favor of the application for a new trial. But the defence of usury went to the avoidance of the entire note, and, if proved, entitled the defendant to a general verdict. In my judgment the proof ot the usury was sufficient. It comes, I admit, from Spencer, and it may be objected, that his credibility was at least shaken at the trial. But is the plaintiff, who introduced him and so strenuously affirmed his claim to confidence, at liberty now to take the exception? or, if a party has the right to avail himself of the shade of discredit thrown upon his witness by his adversary, are not the statements of this witness corroborated by Cunningham 1 and do they not derive additional support also from the conceded facts of the case 1 On these points I have already given my impressions ;—they incline me against the validity of the objection as taken by the plaintiffs, in opposition to the present application. Besides, the question of the title of the witness to credit, if open, belonged to the jury ; and the Judge in his charge to them, told them that the defendant had failed in impeaching this witness, and it was his duty so to instruct them. In the same charge he distinctly presented to them two questions of fact for their decision; one of which referred to another branch of the defence, and the other, although it had reference to the defence of usury, was confined to the conflicting evidence of Keeler and Spencer as to the fact of an agreement, t hat part of the loan upon the notes should be paid in bonds of the lenders; and dicl not touch the question as to the pollution of the paper by the usurious debt it was in part to recover, and which (as we have seen) was treated by the Judge as a point of law arising upon undisputed facts. The only question put to the jury on this head was, whether it was a part of the arrangement between Keeler and Spencer on the 22d of October, when the note in controversy was negotiated to the Hudson Insurance Company, that a part of the amount should be paid in bonds at par, with a view to cover an usurious agreement or not. - And the Judge told them that if they believed Keeler, then they ought to find a verdict for the defendant; and if Spencer, then, for the plaintiffs.
*541 The jury found a verdict for the plaintiffs, and have thereby given their sanction to Spencer as a credible witness, and acted upon his evidence as of sufficient weight to countervail the testimony of Keeler. Now if his evidence was so decisive upon the alleged arrangement for taking part of the loan in bonds, with a view to cover an usurious agreement, are we not fairly to presume, that it would have been equally conclusive of the fact of an agreement for the application (in given events) of the $6000, the residue of the notes, as a further provision and security for the payment of antecedent usurious loans 1 And if so, the jury to whom the general question of the fact of usury belongs, if the decision of the Judge upon the law had been different, would, upon that evidence, probably have given their verdict for the defendant. But it may be proper in this view of the subject, to collect and present in a more distinct and condensed form the material facts proved by Spencer, bearing directly upon the point. In order to judge of the sufficiency of the proofs applied to the rules of law, are we so to expound them, as to induce another jury to find a verdict in favour of the defence of usury 1 And I confess, that if his evidence is entitled to credence, (and I properly appreciate its bearings and force,) the matters it discloses—taken in connection with the conceded facts of the case,—so fully and so clearly establish that ground of defence, that no impartial and intelligent jury could—under proper instruction from the court upon the law—find a verdict against it.
It is conceded, that the note in controversy was, with anote for $5,000, substituted by mutual consent for the two other notes, in the first instance deposited by Keeler with Spencer; and that the substituted notes grew out of an arrangement for the relief of Keeler & Rogers, and Keeler & Mather, from commercial embarrassment, by the interposition of the credit of the defendant and others, in procuring funds to enable them to meet their engagements: that the substance of the arrangement was, that the defendant and those who associated with him, for the aid of these establishments, should make a joint and several negotiable note for $50,000, in favour of K. & R., payable at 12 months, which K. & R. were to negotiate, by procuring it to be discounted for *542 their own accommodation; and that the two co-partnerships, to secure the makers against their liability to pay the note, were to execute to trustees assignments of property to an adequate amount. It is also a conceded fact, that under this arrangement, Keeler, who was a director of the Fulton Bank, on the 22d October, 1825, applied to that bank for the discount of the note for $50,000, so agreed to he furnished him, and at the same time laid before the Board of directors two other notes—one for $15,000, and the other for $10,000—as collateral security for an immediate but temporary advance, until the note for $50,000 should be obtained, and which advance be represented to be indispensable to him, to save his house from stopping their payments; that the board declined acting upon the application at that meeting; and that Spencer, who was President, immediately interposes with an offer of aid to the applicant.
Thus far the witnesses substantially agree, and at this point the discrepancies between them may be said to begin. I proceed to notice the prominent features of Spencer’s testimony as to the subsequent events in the history of the note. He testified, in substance, that on the 22d October, on which day he first took his seat as a director in the Fulton Bank, he found Keeler at the bank applying for the loan of $50,000 by the discount of the note for that amount, which he expected to obtain: that the Hudson insurance Company (of which Spencer was then the President) had an interest in sustaining the credit of Keeler & Rogers, and therefore he, Spencer, judging that the bank was not likely to act on Keeler’s application, offered to advance to the house of K. & R. the sum of $14,000, until they could raise the $50,000 by the discount of the note spoken of by Keeler; that the terms of the arrangement between him and Keeler were, that he, Spencer, should advance to Keeler & Rogers $14,000 on the said two notes—one for $ 15,000 and the other for $10,000, then held by them—and which Keeler had just before offered for a similar purpose to the bank as aforesaid, until the negotiation for the loan of $50,000 was completed; and when that money was raised, the advance of $14,000 was to be repaid, and Spencer was to surrender up the two notes. But if the loan of $50,000 *543 was not effected, and Keeler & Rogers stopped payment, then Spencer was to hold the two notes as security not only for the $14,000 advanced, but for any other sums, which Keeler & Rogers then owed, or might thereafter owe, the Hudson Company. The offer was accepted, and the notes thereupon endorsed by Keeler, and delivered to Spencer, who gave him the company’s check for $ 14,000. It was subsequently ascertained, that the bank would not make the loan of $50,000, and on the 27th October, Benedict, the defendant, (Keeler being also present at the time,) applied to Spencer to exchange the two notes then held by him as aforesaid, for the note in controversy, and the note for $5,000 described by Keeler on his examination : that the exchange was made; that on the 28th October, Keeler applied to him (Spencer) for a loan of $3000, and Spencer advanced that sum to him on the check of Keeler & Rogers, payable on the 39th; but that Keeler & Rogers stopped payment on the 28th; and this sum was not repaid. That it was no part of the original agreement that there should be a substitution of notes, and when the exchange was made, nothing was said about the continuance of the loan. And upon his further examination, he distinctly stated, that the agreement in relation to the loan made on the 22d October was, that in case Keeler & Rogers went on with their business, then they were to repay the loan of $14,000, and take back the notes deposited, as soon as the loan of $50,000 was effected. And that it was also a part of the agreement, that if the advance of $14,000 was not repaid, and Keeler & Rogers did not go on with their business, then the notes were to remain as security for any further claim, which the company might have upon that firm ; but that, nothing was said about bonds or interest, and no part of the loan was to be made in bonds. He further states, that one branch of the business, pursued by the Hudson Company, was the making of loans in their own bonds, and the business was transacted as follows: When a loan was applied for, the company took a note for the amount, and issued a bond to the applicant, payable three months after the note would become due, and bearing an interest of six per cent., payable quarterly ; the borrower, at the time of his application for the loan, *544 also applied for insurance to the amount of the note on a life, until the note fell due; and that the company charged a discount 011 t^le note °f six per cent., and a premium of six per cent, on the insurance, which was paid by the borrower in cash, when the loan was made. But the witness admitted that he did not. know that the company had ever issued a policy on a life insurance, except that he thought they did issue one to a person in Delaware county: he further stated, that Keeler & Rogers, on the 22d October, 1825, at the time of the agreement between Keeler and Spencer for the loan made them on that day, owed the Hudson Insurance Company aboul $¿2,000 on notes and bills discounted for them by the company, of which $18,000 still remained due and unpaid at the time of the examination of the witness. That these notes and bills were all made for the accommodation of K. & R., and were all discounted for them by the company, in their usual way of doing business. That when they were discounted, the company’s bonds at par were given in exchange for them, and those bonds were at that time under par, but that the discount of six per cent., and the insurance of six per cent, for the life insurance, was paid by the borrowers in cash.
From these statements it is clear, the two substituted notes were taken by Spencer for the Hudson Insurance Company, as security for the advance of a loan of $14,000, previously made on the credit and security of the two first notes for $25,000, by that company to K. & R., and for the further security of the other subsisting debts of the borrowers to the company. Whether the substitution of them for. the first notes, was in pursuance of a provision for that purpose in the original agreement, upon which the $14,000 was advanced, as Keeler stated the fact to be, or by the mutual consent and agreement of the parties, at the time of the exchange of the notes, as Spencer represents it, does not appear to me to be material. They both agree in the important fact, that the note in controversy, and the note for $5000, which accompanied it, were exchanged and substituted for, and accepted and taken in lieu of the two first notes. It is not alleged or pretended, that any new arrangement was made, or that the prior agreement underwent any change or modification for *545 settling- or regulating the terms upon which the exchange of notes took place, or the substituted notes were taken and to held. Nor was it necessary. It-was simply an exchange of security. The two substituted notes took the place'in all respects of the two first notes, and were to be held upon the terms and subject to the agreement under which the first notes were deposited, and they are open to all the exceptions, and the same defence against them, which could have been taken to the notes they replaced. The fact admits of no other inference or conclusion, and it is decisive of the understanding and intention of the parties on the subject, that _ they have uniformly acknowledged, and treated those notes as substitutes for those on which the advance was made, and have asserted the same right and interest in them as they would have been entitled to claim in the first notes. Now, the advance of $14,000, made by Spencer for the Hudson Company, was upon the security of the two first notes, which amounted together to $25,000, and the agreement was, that those notes should stand and be held as security, not only for that specific advance upon them, but as a provision and security also, for the payment of the pre-existing debts of K. & R. to the company, which were contracted by the discount of accommodation notes for them ; and those debts or loans upon that discounted paper were undeniably usurious, for the borrowers were constrained to allow an interest of six per cent, upon the sums borrowed, and to pay a premium of six per cent, for an insurance upon a life, to the amount of the loan, for the time the note had to run.
The bare statement of the terms thus exacted for the loan, unexplained as they are, is sufficient to show the negotiations to have been stamped with rank usury. Hay no stress upon the fact so strongly pressed at the trial, that the loans were made in the bonds of the company, which were under par in the market at the time, because, for the reasons-already assigned, I am unable to discover in that operation any corrupt agreement, or any premeditated cover of an usurious loan. I base my judgment of the character of the loans upon the evidence which shows that six per cent, was taken for the loan, and an additional six per cent, exacted under the form and pretext of a premium of insurance. I *546 cannot view this pretended insurance in any other light than that of a cover for the usurious premium. No policy appears to have ^eeil |ssued to the borrower, nor anx contract given him to mani- ■ / ° fest and sustain his claims in case the life should fall in. We find that in the solitary instance in xvhich a real insurance was effected on a life, by the company, a policy was issued and delivered to the assured ; and the fact, that in the case of a life insurance unconnected xvith a loan or discount, a policy was issued to the assured which was understood by the company as obligatory upon them, appears to me to show, that in other cases where a discount or loan, and not a life insurance, was the primary object of the parties, the life insurance for which the borrower was required to make a formal application, and to pay the premium of six per cent., but for which no policy was issued, was not regarded by the parties to the arrangement, as an effective and binding contract; but was merely colourable and intended and designed as a device and contrivance for cloaking the illicit interest exacted for the loan.
If, then, the character of the dealing was a loan at twelve percent., or a higher rate of interest in proportion to the shorter time of the note, as I distinctly understand it to be, it was clearly usurious ; and the note in controversy for $15,000 and that for $5,000 which xvere substituted for the first txvo notes for $25,000, on which the advance was made, being taken and held, as respected the residue and surplus of the contract, beyond the advance and interest, as a further provision and security for those antecedent and still subsisting- usurious loans, were illegal and void. And the note in suit is equally irrecoverable in the hands of the plaintiffs, however innocently they may have taken it, as it would have been in the hands of the original parties to the corrupt agreement. It is well settled, that if any part of the loan or debt for which the note or security was given is usurious, the security, is void; and I understand the courts now to hold, (in consonance, as I conceive, to principle and sound policy,) that it is not necessary that the usurious agreement and the security for the accomplishment of its illicit purpose be simultaneous ; but that if an usurious loan or debt is previously contracted, and at *547 any subsequent time any security is given to the original parties to the contract, or any exchange of securities takes place with them, for the furtherance of the corrupt agreement, as an additional provision and security of the usurious loan or debt; such security becomes equally infected with the taint of the usurious debt, as it would have been if taken at the moment the debt itself was contracted. In the case of Cuthbert v. Haley, [8 Term Rep. 390.] it is admitted and ruled by the Judges, that if one security is stipulated for another, and the first is contaminated by usury, the second, which is substituted in lieu of it, if given to the party to the original contract, is void. And in the case of Tuthill v. Davis, [20 John. 285.] it is held, that a mere change of securities for the same usurious loan, with the usurer himself, can never legalize or purify the original consideration, or give a right of action; but that a new note, given in renewal or exchange for former notes infected with usury, then in the hands of the original party to the usurious contract, without any new consideration, is equally infected with the first notes. The case before me comes fully within the principle of these authorities; for in this case, the previous notes for which the two notes were taken in exchange, were clearly tainted with the usury which infected the debts they were in part given to secure ; and those tainted securities were in the hands of the usurers at the time of the exchange. But the case of Harrison v. Francis Hannel, [5 Taunton, 780.] is still more apposite. In that case, several usurious transactions had taken place between the defendant’s son and the plaintiff, in which the former was indebted to the plaintiff in a considerable amount. On the last transaction the son applying for another advance, the plaintiff agreed to make him a further advance of £180, on legal interest, but as the condition of doing so, the son was to obtain from his father three acceptances, two for £100 each, and the third for £50, payable at different periods, to be securities for the whole of his debts,—parts of which debts, to the amount of £100, were for legal, and the residue for illegal consideration. The whole of the father’s acceptances, however, if applied to the sound parts of the debts, would not be enough to discharge the same, together with the further advance *548 of £150. The bills of the son, accepted by the father, were given to the. plaintiff under this agreement, and the bill for £50, had been Pa'4 The action was brought on one of the bills for £100 , and it was held that the plaintiff could not recover, and the decision was put, not upon the ground that the father’s acceptances were 0f themselves upon illegal consideration, for they clearly were not,—but because they were deposited to ensure another contract which was usurious. It was the agreement to obtain them, and the actual transfer and deposit of them under that agreement, as a provision and security for a pre-existing debt, mixed up and Composed of sound and unsound items, that gave them the taint which polluted them. And it was because the part of those debts which were usurious, was, by the agreement, entitled to partake, and might partake, of the benefit of that security, that the acceptances were all held to be tainted and void, notwithstanding that they were not given or contracted for at the time of the corrupt agreement, but long subsequently, and for a new consideration to the extent of the advance of £150, and no usury was exacted upon them, notwithstanding that they were separate and distinct hills, capable, each of a distinct application, and the entire amount of them was insufficient to repay and satisfy the advance upon them at legal interest, and the sound part of the subsisting debts.
The Court said, in answer to the arguments drawn from these sources, that the bills were agreed to be deposited for the security -of the whole debt, and were consequently given for the one part as well as the other; that the court or the defendant had no power to direct or controul the proceeds, or to cause the same to be applied to the legal debts, but that the plaintiff might apply the money, if allowed to recover it, to the satisfaction of the usurious debts, and then sue the son for those which were legal; and Chambre, J. said, that contract was entire, and the security given as well for the illegal as the legal part of the debt. A single •glance at the two cases will show the striking analogy between them, and how closely they resemble each other in their leading features. If that case be sound, the rule it so fully discloses must govern this.
*549 In that case, the father’s acceptances were long subsequent to the son’s usurious contracts with the plaintiff, and the consideration for them was, in part, a further advance of £150 at legal interest, the residue only being made applicable to the payment of the antecedent debts, two of which were upon legal considerations, and which legal debts, with the advance, were more than sufficient to exhaust the whole security. Yet, because the residue of those pre-existing debts of the son were upon usurious considerations, the whole of the acceptances were adjudged to be void; and in this case, the first notes, from those substituted for them, received their taint, though given long after the usurious debts of K. & R. to the Hudson Company were contracted; and not taken under, or simultaneously with, the corrupt; and, though the consideration of the long advance upon them was free from the taint of usury, yet because they were given as an entire provision, and provision not only for the legal loan, but for the subsisting debts anteriorly contracted upon corrupt considerations also, they must, upon the principle of the case cited, be held irreconcileable in a court of law.
The cases differ in this particular, that in the case cited, the sound debts of the son to the lender, and the further advance by him, were sufficient to absorb the whole amount of the acceptances. But in this case, the advance is insufficient to exhaust the note in suit, and a surplus of $1,000 of that note, and the whole of the note for $5,000, would be applicable, and to be carried to the credit of the usurious paper. That decision has therefore" gone further for the suppression of usury than we are in this case called upon to go. I am aware that Spencer, on the 28th October, lent Keeler $3,000 on the check of K. & R. payable on the 29th October, and that K. & R. stopping payment on that day, the check was not paid. No interest appears to have been taken or charged on this loan; and it was pressed upon us at the argument, as a pure and legal debt, towards the payment of which, the residue and surplus of the note in suit ought to be applied. I have not particularly noticed this loan, because it has not struck me as a material ingredient in the merits of the controversy. In the first place it is not sufficiently *550 shown that the company were the lenders, or could exercise the right, if permissible by law, to apply the security to its satisfacti°n* Keeler testifies that this loan was made to him by Spencer out of his own pocket. K., therefore, did not regard if as an advanee by the company, or intend that it should partake of the benefit of the security furnished by the notes for other debts. And Spencer says, that he made the loan on the application of Keeler, and upon the check of K. & R. He does not say that the loan was made by him for the company, or was so explained or understood by Keeler. He dees, indeed, make use of this expression, that when K. & R. failed, they owed the Hudson Insurance Company, #10,000, exclusive of the advances of $11,000, and #3000; from which mode of expression it might be inferred, that both advances were understood and intended by him to be made by the company. But he nowhere avers, nor does it appear in evidence, that the company were the lenders. But suppose such to be the fact, still both advances would fall short of the amount of securities, and the sum of $3000, would remain for the furtherance of the corrupt agreements. Neither that check nor the note for $5000 are in evidence, and the case is silent as to their destiny or disposition. How could they, then, be available to the plaintiffs at the trial for any purpose 1 The check, if produced, might be found to be clearly out of the pale of the protection of the note. But the decisive answer to its pretension to that protection, is, that upon the plaintiffs’ own showing, it must deduce its title to partake of the surplus fund, from an agreement which devoted that fund to the security and satisfaction of subsisting debts, which were grossly usurious, and which it commingles with both the former and subsequent advances, and entitles to a common interest in it, with them. The privity and knowledge of the advance of $14,000, which this note was first to repay, or the soundness of the subsequent loan, cannot rescue them from the deleterious effect of the corrupt agreement for the application of the residue and surplus of the notes beyond the advance of $14,000, to the security and payment of the antecedent and subsisting loans. The taint of the infected notes polluted the whole security and avoids it in toto. This rule may seem rigor *551 ous, but experience has shown it to be necessary, in order to reach and counteract the devices and schemes of the usurer, whose interest would tempt him on all occasions to intermix the corrupt with innocent loans; if the sound part of the loans was in .jeopardy by the operation, and a security given at the time, or subsequently taken for the whole debts, though invalid as a provision for the corrupt loans, it could still be made available td him, as being for the satisfaction also of those which were untainted with usury. The lender would always be safé in realising the value of the security. Having parted with his whole power and controul over it, and vested the same in the lender without any special agreement or direction for the application of the avails of it,—must not the lender, thus possessed of the security with thése ample powers over it, have the right to apply the proceeds to the payment of the debts for which it issued in such order as he may think proper 1 If so, the usurious loans as being precarious demauds-, would have the preference and be first paid. And the only effectual remedy, for the mischief would seem to be, to adjudge the whole security void, if any one of the debts which are to partake of its benefit is tainted with usury.
On these grounds, the defence appears to me conclusive, and withal so impregnable, that the plaintiffs, on the same evidence, and with instructions from the court upon the law, corresponding with our opiniohs, could hot hope to escape on another trial, from a verdict against them. And I deem it proper, therefore, to refrain from expressing my opinion upon the other branches of the defence; for, if it should be conceded that the negotiation of the notes to the Hudson Insurance Company, and the advance of that company upon them, did not bring them within the prohibition of the restraining act, and that the operations" of the company with them were not so entirely unauthorised by their charter as to affect their validity, or the right of recovery at law upon them, in the hands of that company, and that the plaintiffs at the time the note in controversy was taken by them, had no knowledge, and were not chargeable in law for actual or constructive notice of any part of its previous history, some of which are, however, in part conceded; yet if the note was tainted with *552 usury, it is void. And, admitting Usury to have been a question of fact for the jtiry, that, question, in the views I have taken of it, was not submitted on this trial to the consideration of the jury, and must be referred to another jury. The motion for a new trial is granted on the payment of costs,
Oakley, J.
This was an action on a joint and several promissory note, dated the 22d of October, 1825, for $15,000 payable in twelve months at the Fulton Bank, without interest, to the order of Keeler & Rogers. The note was signed by the defendant and W. S. Dezeng, J. H. and E. S. Beach, Gilbert F. Lush, Chandler Starr, Elias Mather & Co., Spencer Stafford, H. & S. Stafford and Gregory & Bain. The plea was the general issue with notice of special matter. The jury found a genera] verdict for the plaintiffs for the full amount of the note. The defendant now moves for a new trial on several grounds. I. It is contended, that the note in question is void on the ground of usury, and that the Judge at. the trial did not direct the jury correctly on that point. I shall first examine this feature of the case. [The Judge here stated the facts of the case as far as they relate to this point, and proceeded as follows:]
The law on this subject seems to be well settled. If, on the discounting of the notes and drafts held by the company on the 22d of October,the premium of six per cent, on life insurance was taken, as a cover for exacting more than legal interest on these loans, these notes and drafts were clearly usurious. It is also clear, that if the note on which the action is founded, was made solely for the accommodation of K. & R., and was negotiated by them to the Hudson Company, as security in whole or in part, for such usurious paper, it is also usurious and void. These however, are questions of fact, which ought to have been submitted to the jury, and however strong we may consider the evidence on these points, I do not see that we are at liberty, as the case comes before us, to determine them. The Judge at the trial charged the jury, that if the note in question, was negotiated to the Hudson Company to secure pre-existing usurious paper, in the hands of the company, it was not therefore, itself usurious. If the Judge *553 erred in this opinion, it folloAVs of course, that there must be a neAV trial.
In the case of Tuthill v. Davis, [20 Johns. Rep. p. 283.] the Supreme Court held, that a mere change of securities for the same usurious loan to the same party who received the usury, or to a party having notice of the usury, does not purge the original illegal consideration, so as to render the new security valid. The same doctrine was held in Jackson v. Henry; [10 Johns. Rep. p. 195.] and the case of Cuthbert v. Haley [8 Term. Rep. p. 390.] is there cited and sanctioned. In Tate v. Wellings, [3 Term Rep. p. 537.] the same rule was laid down by Lord Kenyon, and more recently in Preston v. Jackson, [2 Starkie, 211.] by Holroyd J., at nisi prius.
The principle of all these cases is familiar, and Avell settled. In the present case, however, it is said that the loan of the 14,000 on the 22d of October, being clear of any usurious taint, affords a new and valid consideration for the notes negot.ated by K. & R. on that day; and although they were to remain on the happening of a certain contingency, as a security for other paper, Avhich might be usurious, that circumstance cannot make them void. It is to be remarked, that the contingency alluded to, actually happened, and the notes were accordingly held by the Hudson Company as valid notes for the full amount under the original agreement, upon Avhich they Avere negotiated, and I am of opinion, that the new consideration for the notes arising out of the loan on the 22d of October, being coupled with the agreement that they should be held as security for other usurious paper, does not take them, out of the operation of the statute against usury. The contract, on which they were negotiated, Avas entire, and being void in part by the statute, must be considered wholly Aoid. This principle is fully recognised and established in Harrison v. Hannel, [5 Taunt. p. 780.] and in a case stronger than the present, in favour of the impeached security.—In that case, the acceptances in question, applied to the sound part of the transactions, would not pay the money actually advanced, withoutusurious interest; Avhereas, in the case now before us, the neAV loan *554 6f the 22d of October, with the subsequent advance of $3000, is less than the amount of the two notes negotiated at that time.
R was contended on the argument, that the note in question was not an accommodation note for the benefit of K. & R., and , and was, therefore, a valid subsisting contract at the time it was passed to the Hudson Company. If this was so, any usury in the agreement at the time of its negotiation to the company would not affect it. This view of the subject was thought to be supported by the assignment of the property of K. & R. to the makers of the note. It was said that that assignment constituted a good consideration for the note of $50,000 mentioned in if, as between the makers and payees ; and that K. & R. could have enforced payment of it, though it had never been negotiated by them. Assuming that the note now in question, may be considered as having the same connection with the assignment as the note for $50,000, it is quite clear, that it was not the intention of the parties that it should be paid, unless it should be negotiated by K. & R., and the money raised on it for their benefit; and the other evidence in the case is quite conclusive to show, that all the notes in question were made exclusively for the accommodation of K. & R. They were not, then, subsisting notes in judgment of law, until they were negotiated by the payees, and any usury in such negotiation is fatal to them. [Marvin v. McCullum, 20 Johns. Rep. p. 288. Mann v. Commission Company, 15 Johns. Rep. p. 44. Powell v. Waters, 17 Johns. Rep. p. 176.]
It is also contended, on the part of the defendant, that the note in question is void by virtue of the 2d section of the act to restrain incorporated Banking Associations. [2. R. L. p. 214.] That act provides, “that no person unauthorized by law “ shall become a member of any association institution or “ company, or proprietor of any bank or fund for the “ purpose of issuing notes, receiving deposits, making dis- “ counts, or transacting any business, which incorporated banks “ may transact.” The act inflicts a penalty on any person coming within its scope, and then provides, that “ all notes and securi- “ ties for the payment of money or the delivery of property made “ or given to any such association, institution, or company, not *555 “ authorised as aforesaid, shall be null and void.” The note in question having been negotiated to the Hudson Insurance Company, partly on a loan of money, and partly in security for notes and drafts previously discounted by that company, it becomes necessary to ascertain whether that company was acting within the scope of its authority, as derived from its act of incorporation. In the case of the People v. The Utica Insurance Company, [15 Johns. R. p. 358.] the general principle is laid down, that a corporation has no powers except such as are specially granted by the act of incorporation, or such as are necessary to carry into effect the expressly granted powers. And this principle has since been constantly recognized. This company was incorporated for the purpose of making insurance against fire, marine insurance, and all other insurances not prohibited by law. [Ses. 34. Ch. 154.]
The first section of the act of incorporation, provides, among other things, that the Company shall have the power of “ con- “ tracing and being contracted with, relative to the purposes and business,” for which the corporation was created, as declared in the said act. The second section prescribes the mode of securing the the capital stock, which is to be by “ lien on real estate.” By the 9th section, the company is authorised to invest the capital stock, from time to time, in any of the public stocks. The 7th section specially defines the kinds of insurance which the company is at liberty to make. The 11th section prohibits the company from making any contracts for the payment of money only, unless under the seal of the corporation.
Here, then, is a corporation with clearly defined powers—its objects specially pointed out, and its right of making contracts strictly limited to the purposes and business for which it was created. The mode of investing and securing its capital stock, is distinctly prescribed, leaving no room for implying any power of loaning money generally for the purpose of such investment. It is true that it had, by fair implication, the right to make contracts for the payment of money under seal, but such right cannot be considered as general and unlimited, without disregarding all the other provisions of the act. The general restriction of the power of contracting to the purposes of insurance, taken in connection *556 with the power of making contracts under seal for the payment of money, clearly shows, that the latter power must be confined to the giving of bonds or making of contracts for the payment of . , , , , , , . such debts as the company should incur m the course oi its regular business. Any other construction would conflict with the general intent of the act of incorporation, and would, in its practical effects, defeat most of the restrictions and limitations contained in it.
It is quite clear, from this view of the act, that the company had no right either to discount a note or to loan money in any manner on the security of a note. It is not given to it expressly by its charter, nor is it in any degree necessary to carry into effect any power delegated to it. The case comes entirely within the principles laid down by the Supreme Court, in the People v. The Utica Insurance Company, and in the cases of The New-York Firemen Insurance Co. v. Sturges and Ely. [2 Cow. R. 664. 678.]
It appears from the testimony of Spencer, that the company, acting under this charter of strictly limited powers, abandoned almost entirely all the objects for which it was created ; that it made little or no insurance of any kind, and that its general and usual business in the employment of its capital, was discounting notes, and loaning money on notes, or other personal security.
Here, then, was an existing fund diverted from its legitimate jpurposes, and applied to one, at least, of the kinds of business generally transacted by incorporated banks; and in the case of The Firemen Ins. Co. v. Ely, Sutherland, J. says that the “ ordinary and habitual application of a fund to any of the purposes “ of banking, is conclusive evidence of its creation for such pur- “ poses.”
In the People v. Bartow, (6 Cow. R. p. 294.) the Court say, that “ the discounting of notes is the principal business of a banking “ institution,” and it would be doing violence to common sense to consider that the loaning of money on notes, when the interest is taken at the termination instead of the commencement of the loan, is not a discounting of such notes within the fair meaning of the restraining act. Nor can it be successfully contended, that the giving of bonds in exchange for notes discounted in lieu *557 of other notes or contracts, for the payment of money not under seal, (as is ordinarily done by banks,) can at all vary the case. Such distinctions, if sustained, would effectually render the restraining act a dead letter.
Here, then, we have a company or association unauthorized by law to carry on any kind of banking business, possessing a fund, and habitually devoting that fund to some of the ordinary purposes of banking. It does not seem to admit of doubt, that in doing so, it was in the constant habit of violating the provisions of the restraining act; and it follows, that all notes or securities given to it are null and void by the express terms of the law.
The Judge, on this part of the case, held at the trial, that the negotiating of the note in question to the Hudson Company, unless it was usurious, did not render it invalid. In this, I apprehend, there was error, and that upon this ground, also, a new trial ought to be granted.
There are other questions involved in the case, upon which I have not thought it necessary to give any decided opinion, in the present stage of the cause. I will, however, state my present view of them.
I. The note, if not void by the restraining act, is clearly taken by the Hudson Company without authority; and it may well be contended that no action can be sustained on it by the company. If the plaintiffs had notice of the fact, that the note had been negotiated to that company when they took it, the illegality of the transaction can be set up against them. This question of notice was left to the jury, but under instructions too narrow. They were told, that notice to individual directors was not notice to the corporation, unless brought home to the board, or to the officers of the bank. I think that, under some circumstances, notice to a director ought to charge the corporation, as where the director acts in any particular business, as the special agent of the bank, as in the case of Rathbone. He was one of a committee to inquire as to this very note, and he knew, or thought he knew, that the note had been negotiated to the Hudson Company. He may have been mistaken in this, but that matter ought to have been *558 left to the .jury. I think that, under the circumstances, whatever ought to have put Rathbone on inquiry relative to the note, were it If - n i vid-ai case, ought also to be considered sufficient to ° charge the corporation with the duty of making inquiry also. The true question is not, whether the bank had positive knowledge of the fact, but whether they had knowledge of circumstances which, in the exercise of ordinary prudence, ought to have put them on their guard.
II. As to the extent of the recovery by theplain tiffs. I am inclined to thipk, that the Hudson Company could not sue on this note: and the plaintiffs cannot, in any event, recover beyond the extent of their adva nee on the note. If the note itself was void in the hands of the company, it seems that the money loaned might have been recovered back by that company, and that for any thing advanced by them on the note, beyond the sum received from the plaintiffs, the company may still have their action against Keeler & Rogers. [10 John. Rep. 198. 8 Cowen’s Rep. 20.]
III. In relation to the questions, which arose on the trial as to the impeachment of the character of witnesses. I think that a witness cannot be asked, whether from his personal knowledge of the impeached witness he would believe him under oath.
The English rule seems to be, to inquire of the impeaching witness his means of knowledge of the general character of the witness impeached, and whether, from such knowledge, he would believe him under oath.
This seems to me the true rule. To inquire only as to general character for truth seems too narrow. His general character for truth and honesty must be the ground of his general credit as a witness. If a man when asked that question says, that it is good, no further inquiry is necessary, as the law then implies, that the witness is entitled to credit. If the answer is, that it is bad, the other party may inquire into the general grounds of such opinion, in order to enable the jury to determine as to the extent of such bad character, and how far it ought reasonably to discredit the witness ; and it is competent also, in such a case, to ask whether, *559 notwithstanding such general bad character, the impeaching witness considers him entitled to credit upon oath, because seems to fix the extent and nature of the general bad character attributed to him. '
IV. As to the question put to M. Hoffman. It seems to me, that the Judge erred in telling the jury, that they were to lay out of view entirely the evidence of Spencer’s bad character, if it connected itself solely with the conspiracy cases. A bad character .may, and often does arise from a particular transaction. Suppose the case of a man tried for perjury and acquitted, but on grounds of a technical kind. That trial may justly fix his character as a witness, to be infamous.
The true rule is, that you may inquire into the origin of the opinion, that a witness’s character is bad, for the purpose of enabling the jury properly to estimate it; but it is going too far to tell them, that they cannot notice such evidence at all, if it arises from a charge made against the witness, of which he was acquitted.*
New Trial granted.
[Ward & Hoyt, Att’s for the plff's. R. C. Wheeler, Att'y for Deft.]

 Upon this last point, vide 4 Wend. R. 229. The People v. Mather.