## Case No. 16,609.

### UNITED STATES v. VANSICKLE.

[2 McLean, 219.] [1]

Circuit Court, D. Michigan. Oct. Term. 1840.

IMPEACHMENT OF WITNESSES — BAD CHARACTER — WHAT MAY BE SHOWN.

1. To discredit a witness it is not competent to prove general bad character, disconnected with his veracity.

[Cited in U. S. v. Dickinson, Case No. 14,958; Teese v. Huntingdon, 23 How. (64 U. S.) 12.]

[Cited in brief in Bishop v. Wheeler. 46 Vt. 412; Fletcher v. State, 49 Ind. 132, 133; Hamilton v. People, 29 Mich. 187; Hillis v. Wylie, 26 Ohio St. 577.]

2. The proper inquiry is, what is the general character of the witness, where he resides, for truth.

[Cited in Teese v. Huntingdon, 23 How. (64 U. S.) 12.]

[Cited in Frye v. Bank of Illinois, 11 Ill. 379; Holbert v. State. 9 Tex. App. 219; Kennedy v. Upshaw, 66 Tex. 453, 1 S. W. 312.]

3. And the witness, under examination, may be asked. from your knowledge of his general character, would you believe him under oath.

[Cited in Teese v. Huntingdon, 23 How. (64 U. S.) 12.]

[Cited in Holbert v. State, 9 Tex. App. 219.]

4. Particular facts, of a criminal nature, cannot be proved to discredit the witness. The inquiry must be general.

The District Attorney, for the United States.

Mr. Bates, for defendant.

McLEAN, Circuit Justice. The defendant [William Vansickle] was indicted for knowingly and corruptly obstructing the marshal, in the service of a subpœna, on a witness, in certain criminal cases, in which he, with others, was defendant, under the twenty second section of the act of congress of the 30th April, 1790 [1 Stat. 117]. The plea of not guilty was entered, and a jury were called and sworn to try the issue. Remember Lummis, a witness, stated that the defendant took her from place to place while the marshal or his deputy was in pursuit of her to summon her as a witness. That the defendant had frequent interviews and conversations with her, whilst she was kept out of the way, and that he proposed to give her a tract of land if she would avoid the process; and he represented to her that if the process were served she would be taken to Detroit and confined in jail, unless she could give bail for her appearance. By this means the process was eluded for some weeks, until the witness became dissatisfied and resolved to appear, and communicated such intention to those who found means to aid her determination. Other witnesses, called by the prosecuting attorney, in many important particulars, corroborated the statements of this witness. The witnesses on the part of the defendant were sworn and examined,

chiefly with the view to discredit Remember Lummis, the principal witness for the prosecution. And a question was made as to the form and substance of the questions to be propounded to the impeaching witnesses. On the part of the defendant it was contended, that they had a right to examine into her general character and standing in society; and, particularly, whether she was not a lewd woman in general estimation. On the other side it was insisted, that the questions must be limited to the general character of the person impeached as to truth and veracity; and whether the witness, from his knowledge of her character, would believe her under oath.

It is singular that there should be great contrariety in the decisions on this question, which is of almost daily occurrence in the administration of justice. All the authorities agree that the inquiry must be general. whether it relate to veracity or to character in a more enlarged sense. A witness is compelled to appear and testify, and it would be most unjust to permit specific facts to be proved against him, of which he has had no notice, and which materially affect his reputation. Every individual is supposed to be able, at all times, to establish or defend his general character; which is nothing more than the prevailing opinion of the community where he resides. For this charge being made in a general form, may be met and refuted in the same manner. The regular mode of examining into general character, says Phillips on Evidence (vol. 1, 1839 Ed., 292), is to inquire of the witnesses whether they have the means of knowing the former witnesses' general character, and whether, from such knowledge, they would believe him on his oath. In answer to such evidence against character. the other party may cross-examine those witnesses, as to their means of knowledge and the grounds of their opinion. In the case of Hume v. Scott, 3 A. K. Marsh. 260, the proper question was held to be, "what is the general moral character of the witness?" and, in their opinion, the court say that the jury may draw unfavorable inferences as to the truth of the witness. from his general turpitude. In the case of People v. Herrick, 13 Johns. 84, the reasoning of the court would seem rather to sustain the above position. They say the conviction of an infamous crime, as petit larceny, would as much destroy the credibility of a witness as. if it related to his truth. State v. Boswell, 2 Dev. 209. You may prove the witness to be of bad moral character. The question need not be restricted as to his veracity. The same effect is the case in 1 Hill, 251, 258, 259. And in the case of Fulton Bank v. Benedict, 1 Hall. 558, the court say—to inquire only as to general character for truth seems too narrow. But the weight of authority limits the inquiry to the veracity of the witness impeached; and it seems the question as to general character is too vague.

[1] [Reported by Hon. John McLean, Circuit Justice.]

The witness cannot advert to particular facts, or to his personal knowledge, of the character of the individual impeached, but to his general reputation for truth. This reputation is general character. To form a general character as to truth it is not necessary that the individual should have sworn falsely, or, indeed, that he should ever have been examined as a witness. The public opinion is by no means limited to this, as to a man's veracity. It is formed by combining the elements of his character; and it is this result of the public mind which is to impeach the witness. A man who is notoriously immoral, who is believed to be dishonest, and who is addicted to misrepresentation, can never have a good character for truth. And as it regards defects of character, that community has yet to be discovered which does not feel, at least, as strong an interest in the investigation of a man's faults as his virtues. The character of every man is known in the community where he resides. His acts, whether good or bad, have been scrutinized, and, in most instances, if not in all, an opinion has been formed as to his veracity. It is this opinion which is evidence, and not the particular circumstances which led to the formation of such an opinion. In behalf of the witness these circumstances may be inquired into to show, that they originated in the controversy then pending, or that an erroneous impression had been made on the public mind.

It is said in some of the cases cited, that the inquiry as to the veracity of the witness is too limited; and that the inquiry should be as to character generally. That if the answer shall be—the witness sustains a bad character, the question may then be asked, in behalf of the witness, whether the character spoken of is in regard to his veracity. But if general character, without limitation, is the object of inquiry, why suffer it to be thus qualified? If the question as to the veracity of the witness be proper, in support of the witness, to explain or do away the effect of general bad character, does it not show that it is the question, and the only question, which should, at first, have been propounded. This is incontrovertible, unless bad character in the abstract, and without reference to truth, be proper evidence. Now what shall constitute bad character? Shall the witness be questioned on this point? And if he be, may he say that the witness impeached is generally believed to be a common prostitute. That this was proper was decided in the case of Com. v. Murphy, 14 Mass. 387. This, however, was overruled in the case of Com. v. Moore, 3 Pick. 194. In the case of Evans v. Smith, 5 T. B. Mon. 365, 366, unchaste character was held admissible to impeach a witness. But this decision is believed to be against the whole current of authorities, English and American. We do not mean to say that the chasteness of the witness may not become a proper question on an indictment for a rape, or in a case which may be sup-

posed; but that it is not a proper question, under ordinary circumstances, to discredit a witness. If such a question be proper, shall it be limited to the character of a female? Must it not as well apply to the other sex? Again, the question is asked, what shall constitute general bad character. In some communities a Mason or an anti-Mason, an abolitionist or anti-abolitionist, a man who plays cards or engages in horse racing, may be esteemed, as the opinions of the majority in the neighborhood may preponderate, to have an immoral or bad character. Shall this opinion then, of bad character, so indeterminately formed, be evidence on which to destroy the credit of a witness. If this opinion be evidence, it is so without showing the basis on which it rests. For, as has been shown, it is unnecessary, if it be not improper, in the first instance, to prove how this opinion has been formed. Is it evidence in the broadest sense, without explanation or restriction? That it is evidence so far as bad character has, in the public opinion, affected the veracity of the witness, is admitted. But is it evidence independently of this?

The witness must be impeached, not by proving particular facts, for these he is not supposed to be prepared to meet, but by showing his general character in the public estimation. Facts are not to be proved from which the jury may infer a bad character, but it is the inference, drawn by the public, which is evidence. An inference already drawn and embodied in the public opinion, and which, as a fact, is susceptible of proof. Now what is the fact thus to be proved? Is it as to the bad character of the witness generally, or his bad character as to veracity. The object of the examination would seem to be a sufficient answer to this inquiry. It is to shake and overthrow the credit of the witness. Now this is effectually done by showing that in the neighborhood in which he lives, and where his character is best known, he is not considered worthy of credit. Shall a public opinion which does not reach his credibility, be proved as a fact from which the jury may infer a want of credibility? This would be an inference from public opinion which had not been drawn by the public. And would it not be a most dangerous species of evidence? It would be a conclusion inferred, not from original facts, but from an opinion formed on those facts by the public. It would be an inference on an inference. This would be a new rule, not yet incorporated, it is believed, into the law of evidence. Ancient boundaries may be proved by reputation. But is this done by proving the existence of any facts, in public opinion, short of the boundaries. Marriage is often proved by reputation. The fact of living together as man and wife, and being so recognized by each other and the public, is received as evidence of marriage. But this is a legitimate inference arising from the facts proved. Living together and recognition are not established as a matter of reputation, but

as facts, distinct from public opinion. And from these facts a jury may infer, as well as the public, that the parties were married. And the same rule applies as to proof of pedigree by reputation.

If it were competent to prove that the impeached witness was a common prostitute, had been guilty of stealing, or of any other infamous crime, the inference that she is unworthy of credit might be legitimate. But these things, if true, cannot be established either by proof of the facts, or that they are believed to be true in public opinion. The inquiry, it is insisted, must be general as to character, and if that, in the public estimation. be bad, however it may have been formed, and without the least reference to the veracity of the witness, it is evidence to shake and overthrow that veracity. As the rule now stands, we think, a witness can only be impeached, under this head, by proof of general character as it regards his veracity. The impeaching witness may be asked if he is acquainted with the general character of the impeached witness. If he answer in the affirmative, he should then be asked whether, as it regards his veracity, it be good or bad; and if bad, whether, from his knowledge of the prevailing opinion of the public, he would believe the witness under oath.

Witnesses were examined under the rule here laid down to impeach and to sustain Remember Lummis. The jury found the defendant guilty, and he was sentenced accordingly.