Frye *vs.* Bank of Illinois *et al.*

WILLIAM FRYE, appellant, *vs.* THE PRESIDENT, DIRECTORS AND
COMPANY OF THE BANK OF ILLINOIS, who sue for the use
of JOHN J. HARDIN, *et al.*, appellees.

*Appeal from Calhoun.*

A person who claims under a title paramount, or prior to that sought to be enforced by a bill
in chancery, and whose interests and title are not affected by the relief prayed for, need
not be made a party to such bill.

It is only the general character of a witness for truth and veracity, that should be inquired
into, upon an impeachment of his testimony.

A subsequent mortgagee upon the same premises, for an existing debt, is entitled to prece-
dence of advances made by a prior mortgagee, who has notice of the second mortgage.

It would be inequitable to allow a mortgagor to suffer the mortgaged lands to be sold for
taxes, by buying them in himself, to defeat the lien of the mortgage.

The merits of this suit in chancery are sufficiently stated in
the opinion. The decree appealed from was a *pro forma* de-
cree, entered at October term, 1849, by Woodson, Judge.

BILLINGS & PARSONS and E. KEATING, for appellant:

The interest which disqualifies a witness, is an interest in the
result of the cause, namely: that all concerned in the demand
ought to be made partners in equity: not all concerned in the
subject matter, respecting which a thing is demanded, but all
concerned in the very thing which is demanded—the matter pe-
titioned for in the prayer of the bill—in other words, the object
of the suit. Story's Eq. Pl., 95, note; ibid, sec. 76. Tested
by this rule, the depositions of Joseph Harrison, Stephen Mor-
ris, Henry G. Hart and Hiram Sergeant, taken by the defendants
in error, must be excluded. The record shows that other par-
ties should have been made to the bill. In a bill to foreclose a
mortgage, prior incumbrancers must be made parties. Finley
*vs.* Bank United States, 6 Cond. R., 320; Haines *vs.* Beach, 3
J. C. R., 459; Ensworth *vs.* Lambert, 4 J. C. R., 604; McGown
*vs.* Yerks, 6 ibid, 449; Story's Eq. Pl., sec. 193. The defend-
ant may not only raise the objection at the hearing, for want of
proper parties, but the Court itself may raise the objection, when
determining the cause. 1 Barb. Ch. Practice, 321. The exa-
mination as to the credit to be given to the testimony of a wit-
ness, must be confined to general credit, by producing witnesses
to swear that the person is not to be believed on oath. Troup
*vs.* Sherwood, 3 J. C. R; 563; Commonwealth *vs.* Churchill, 11

Metcalf, 538; Noel *vs.* Dickey, 3 Bibb, 268; Gilchrist *vs.* McKee, 4 Watts, 380; United States *vs.* Vansyckle, 2 McLean, 219; Ford *vs.* Ford, 7 Humphrey, 100; Bakeman *vs.* Rose and wife, 14 Wend., 110; Rector *vs.* Rector, 3 Gilm., 117. The declarations of John Shaw, that he had given a mortgage on the lands to Frye, which he subsequently mortgaged to the complainants, made before the mortgage was executed to the complainants, are admissible in evidence. 1 Greenleaf Ev., secs. 125, 149; West Cambridge *vs.* Lexington, 2 Pick., 538; Davis *vs.* Pierce *et al.*, 2 Dunford and East, 20; Carne *vs.* Nicoll, 27 English Com. L. R., 446; Woolway *vs.* Rowe, 28 ibid, 52; Beers *vs.* Hawley, 2 Conn,. 469–70; Demming *vs.* Carrington, 12 Conn., 1; Norton *vs.* Pettibone, 7 Conn., 323; Ramsbottom *vs.* Phelps, 18 ibid, 285. The mere silence of a prior mortgagee is not sufficient to postpone the prior mortgagee. There must be actual fraud charged and proved. Brinkerhoff *vs.* Lansing, 4 J. C. R., 66; Berry *vs.* Mutual Ins. Co., 2 ibid, 607; 1 Story on Equity, 380, sec. 384 to 393. Sums subsequently lent on notes, if distinctly agreed at the time to be on the security of the mortgaged property, will be allowed to be tacked. Matthews *vs.* Cartwright, 2 Atk., 347; 1 Story's Eq., sec. 416, 417; 4 Kent, 175; Brinkerhoff *vs.* Marvine, 5 J. C. R., 325. A voluntary conveyance made without consideration, by a person, whether insolvent or not, cannot be avoided by a subsequent creditor, unless it is proved that the conveyance was made for the express purpose of defrauding such creditor. Howe *vs.* Ward, 4 Greenleaf, 198, and the numerous authorities there referred to.

D. A. Smith, for appellees:

Complainants in their bill and amended bill aver, that mortgage to Frye was antedated, and fraudulently recorded, as of a date some years before it was executed; that it was for an inadequate consideration, and given to secure Frye in an ostensible sum, amounting to much more than Shaw really owed him; that it was not *bona fide*, but was made to the intent to delay, hinder and defraud the creditors of Shaw. These are the issues to be tried in the case.

When consideration is impeached by proof of suspicious circumstances or badges of fraud, the *onus probandi* of considera-

tion relied upon by the mortgagee, is devolved on him; and if he cannot prove it, must abide by his legal misfortune or necessity of his position. A cunning and unscrupulous man may do much in four years to heal or patch up a fraud. Equivocal efforts *post litem motam* always to be looked upon with distrust, or very strictly scrutinized, and ought not to overcome the repeated, deliberate and solemn admissions of a party making such efforts; which admissions have been made under unguarded circumstances, and before the movement of strife, and before there were any inducements to a sinister or tortuous course of conduct. As to admissions against a party's interest, see 1 Greenleaf on Ev., sec. 200.

As to mortgage standing as security for future advances, is an afterthought, not admissible under either of Frye's answers. If it were admissible, any items in it since the date of the mortgage to the insurance company and Atchison in January, 1839, could not prejudice them. 1 Bibb, 200; 6 J. C. R., 429; 2 Powell on Mort., 533, note 1. But if admissible, why was not interest on the $400 bond, dated in December, 1827, estimated at the rate of twelve per cent.? Shaw had long before that given a receipt, acknowledging the deposit of the patent for the floating claim. But assuming that Frye's mortgage was truly dated and recorded, and was for a full and fair consideration, ought he not to be postponed to the Bank of Illinois, because of the fraud he perpetrated upon her, in neglecting, in his certificate, to state that he had a mortgage on the property? Was he not thus standing by, in fraudulent silence, and inducing her to loan her money under a delusion? See cases collated, 1 Pirtle, 316, sec. 149. See the rule as to impeaching a witness, 1 Greenleaf, sec. 461, 462. This is an abstract question, affording a fit occasion for the Court to settle the form of questions impeaching a witness.

The tax sales of the 27th and 28th of April, 1840, were probably a part and parcel of the fraud between Frye and Shaw. By quit claim deed, in May, 1844, Shaw conveyed to Frye, he, Shaw, having been under obligation to keep the taxes paid; and he, Frye, having actual and constructive notice of the mortgage to complainants, can he be in any better condition, or have any superior equity to Shaw. But if this suggestion goes for nothing, there is no evidence in the record of any judgment

47

or process, in virtue of which the lands were sold for taxes. This claim is surely baseless. That his mortgage was colorable —or a mere shadow—for an inadequate consideration, to keep Shaw's creditors from getting the property, and the better to enable Shaw to settle with his creditors, see 3 Monroe, 1 ; 1 Leading American Cases, 55, 56 ; 23 Maine, 221. As to necessary parties to a bill to foreclose a mortgage, see Story's Eq. Pleading, sec. 193, and note ; 6 Paige, 637 ; 6 J. J. Marshall, 432. As to the interest of a witness that will disqualify him, see 1 Greenleaf Ev., sec. 389–90, 523–24. As to the doctrine of impeaching a witness, see 1 Greenleaf Ev., sec. 461, 462. As to doctrine as to leading questions, see 1 Greenleaf, sec. 434, 435.

In the application of the case, 1 A. K. Marshall, 332, I insist that our statute authorizing the waiver of the answer on oath, does not vary the rule as to the use of an answer in making up the issues, or proving the same. If the defendant relies upon special affirmative matters in avoidance, or avers special consideration, the *onus probandi* is upon him. Irrespective of this point, if the defendant, Frye, relies upon the general *prima facie* evidence of consideration of the note and mortgage, we have impeached the same for fraud, by his own confessions, as well as much other evidence.

Opinion by Mr. Justice TRUMBULL :

The appellees, who were complainants in the Court below, filed their bill against John Shaw and William Frye, alleging that Shaw, for the purpose of securing various sums of money which he owed them, being chiefly borrowed money, executed two mortgages, one to Atchison and the insurance companies, dated January 21, 1839, and recorded June 15, 1839 ; the other to the Bank of Illinois, dated April 21, 1840, and recorded June 3, 1840 ; both mortgages being upon lands lying in Calhoun county. That a large amount of the indebtedness, to secure which said mortgages were given, remained unpaid ; that there was a mistake in the description of one of the tracts of land included in the mortgage to Atchison and the insurance companies ; that William Frye, the appellee, claimed to hold all of the lands included in the aforesaid mortgages, except one tract, under a mortgage purporting to have been executed to him by John

Shaw, May 3, 1836, to have been acknowledged the same day, and recorded June 3, 1836—said mortgage to Frye, purporting to have been given to secure a note of $3,400, due January 1, 1840, drawn by Shaw in favor of Frye; that Frye foreclosed said mortgage without making the appellees parties, and wrongfully holds all of said lands, except two tracts, by purchase under his foreclosure; that the mortgage to Frye was made subsequent to those made to the complainants, and so recorded as to appear to be recorded four years before it actually was; that Frye, who was the recorder at the time, had annexed a false certificate of record; that the mortgage to Frye was fraudulent and void, and given to hinder and delay the complainants in the collection of their just debts; that it was, in fact, made after the execution and delivery of the mortgages to the complainants; that Frye obtained from Shaw a tax certificate to a portion of the lands mortgaged, to aid his defective title, which lands Shaw fraudulently permitted to be sold in 1840, for taxes of 1839, bought them in, in his own name, and subsequently, in 1844, transferred the same to Frye; that Frye afterwards obtained a deed for the same from the collector, and that the assignees of the Bank of Illinois, before the fraud of Frye was discovered, redeemed from him one of the tracts of land included in his mortgage, and obtained a quit claim deed for the same to David A. Smith, which deed they bring into Court and ask to have cancelled, and the sum paid Frye therefor refunded. The bill waives answers under oath, asks for the appointment of a receiver, to take charge of the lands, rent them out, &c., and prays that all the conveyances named in the bill as having been made to Frye, be set aside and annulled; that the lands respectively mortgaged to complainants be sold to satisfy the debts due them, and that Shaw be foreclosed of all equity of redemption in said lands; that the rents and profits go to complainants, and for general relief.

A receiver was appointed, and at the May term, 1847, of the Calhoun Circuit Court, a decree was entered in accordance with the prayer of the bill. The case was subsequently brought to this Court by writ of error, the decree of the Circuit Court reversed, and the cause remanded, with leave to the complainants to amend their bill. 5 Gilm., 332. In their amended bill, the complainants supply all the allegations which were wanting

in the original bill, and aver that the deed from Frye to Smith, which had been cancelled by the former decree while it was in force, was properly cancelled, and the purchase money and interest rightfully recovered and received from said Frye; or, if not, the complainant, Smith, offers to return the money and interest, and asks to have another deed made. Shaw answered the original bill, admitting the execution of the mortgages to complainants, but claiming certain credits thereon, and Frye answered both the original and amended bills, admitting the execution of the notes and mortgages by the defendant, Shaw, as alleged in the bill, but denying any and all fraud in the execution and recording of the mortgage to himself, and alleging that it was honestly made and executed at the time it bears date.

The Circuit Court entered a *pro forma* decree, granting the relief prayed for, and the rendition of that decree is now assigned for error.

It is objected by appellant, in the first place, that those persons who are shown by the answers and evidence to have purchased portions of the property mortgaged to complainants, prior to the date of their mortgages, should have been made parties. Had they been made parties no decree could have been rendered against them; and it is a general rule, that no one need be made a party against whom, if brought to a hearing, the complainant could have no decree. Story's Eq. Pl., sec. 234. No person who claims under a title paramount or prior to that sought to be enforced by the bill, and whose interests and title are not affected by the relief prayed for, need be made a party to a bill. Story's Eq. Pl., sec. 230; Rose vs. Page, 2 Simons, 471; Lewis vs. Lord Zouche, ibid, 388; 1 Russell and Mylne, 656. The purchasers in this case were not, therefore, necessary parties.

In support of the decree, the appellees rely upon three points: 1. That the mortgage to Frye was antedated and fraudulently recorded, as of a date some years before it was executed. 2. That it was for an inadequate consideration, and given to secure Frye in an ostensible sum, amounting to much more than Shaw really owed him. 3. That it was not *bona fide*, but made with the intent to delay, hinder and defraud the creditors of Shaw. The first and third points may be considered together, for if the mortgage to Frye was really executed and

recorded in 1836, as it purports to have been, it can hardly be insisted that it was made to delay and hinder the complainants, as creditors, who did not become such till several years afterwards. The question of consideration will be considered in disposing of the second point. Was the mortgage to Frye, then, antedated and fraudulently recorded, as alleged? This is the great question in the case, to settle which the parties have referred to many exhibits, and taken numerous depositions, which, with the pleadings, cover more than two hundred and ninety closely written pages. To refer in detail to all this mass of evidence, with a view of either reconciling or pointing out its inconsistencies, would swell this opinion to an unreasonable length, and be attended with little practical benefit, as the questions to be determined are chiefly questions of fact, and could not, therefore, be referred to as forming rules of decision in other cases. All the testimony has been carefully examined and considered, but in this opinion we shall only advert to more prominent and important parts of the evidence.

First, then, when was the mortgage executed? Upon its face it purports to have been executed May 3, 1836, and it is regularly acknowledged before John McDonald, a justice of the peace of Calhoun county, on the same day it bears date. The date of the acknowledgment is written out at length in the certificate. It is not pretended that there are any erasures, interlineations or other appearances upon the face of the mortgage and acknowledgment, to indicate that they were not really executed at the time they bear date. John McDonald, who took the acknowledgment, died in 1846, several years after all parties admit the mortgage was executed. No attempt is made to impeach his character for integrity, nor is it pretended that he was a man who would have affixed a false date to an official act. *Prima facie*, therefore, the mortgage must be presumed to have been executed at the time it bears date. Nor is there one single circumstance in the whole record tending to show that it was not executed at that time, unless it be certain declarations proved to have been made by Frye, and which will be hereafter considered, as they relate more particularly to the question as to when the mortgage was recorded. The bill alleges that it was antedated, but we look through the record in vain for any evidence of that fact.

To show that the mortgage was not recorded in 1836, the complainants rely much upon the intrinsic evidence to be derived from an inspection of the books in the recorder's office. On the hearing of the cause in the Circuit Court, record books A and B of the recording of deeds in Calhoun county, and the indexes thereto, were produced and inspected by the Court, and the decree recites : " That the said ostensible mortgage was ostensibly recorded in book A, 3d June, 1836, commencing on the last line of the third page from the fly or unruled leaf of said book, and continued to the middle of the last ruled page, upon the balance of which page is recorded a deed—Benjamin Wales to John Shaw; which last deed was acknowledged before a J. P. of Maine, but is not authenticated, and is entered in the entry or index book to said book A. The last sixteen deeds in that book, and the first fifteen deeds in record book B, purport to have been recorded on the 3d June, 1836. The following peculiarities exist in entry book to book A : for the first time in said entry book, in the description of the lands, seven lines are crowded into the space of five ruled or blue lines in said book, though subsequent instances of a similar character appear in said book, and the entries of the two deeds above referred to appear to be in darker ink than the entries of the preceding deeds. After the entries of the two deeds above referred to, then come the words, " End of volume 1, Book A," written just below the next ruled line; after which, upon the succeeding ruled line, is written, " Beginning of volume 2, Book B ;" after which commences entries of deeds recorded in book B. Between the words, " End of volume 1, Book A," and " Beginning of volume 2, Book B," is a line drawn with a lead pencil ; and that deeds entered in said entry book were separated by lines drawn with black ink. That deeds entered in said entry book, including said mortgage, seem to have been numbered consecutively, though when so numbered does not appear. The said numbering commenced and appears to have been practiced by the recorder, predecessor of the defendant, Frye, and it appeared to the Court, from the character of the ink and writing, that quite a number of the deeds in said book, preceding and succeeding said ostensible mortgage, were numbered at the same time, and that the last deed in book A, contrary to what appears in any other part of said book, is written over the margin, which

has been ruled off by a red ink line throughout said book. That said ostensible mortgage is recorded as of the 18th of April, 1840, in book B, pp. 472 and 473, and that recording is indexed.

There is nothing in all these circumstances set forth in the decrees, as appearing upon the records of deeds and the entry book, calculated to throw suspicion upon the mortgage to Frye, except it be the fact that it was recorded twice : the last time in 1840. The fact that the mortgage was recorded in the latter end of the book, commencing three pages from the fly leaf, proves nothing against it. Some deed must necessarily be the last in the book, but the mortgage was not the last paper recorded. Another deed follows it, and to make the record of the mortgage fraudulent, that of the deed which follows must be fraudulent also. There is no evidence in the case to show that this latter deed was not executed and recorded at the time it purports to have been by the record. The fact that the deed was not so authenticated as to entitle it to be recorded at that time, is a circumstance entitled to but little weight, as recorders were often in the habit of recording deeds not properly authenticated, either because they were not always capable of determining when a deed was duly acknowledged, or because of a willingness to copy almost any paper upon the record, whenever they could get pay for so doing. The entry book, so far from furnishing evidence that the mortgage was not recorded in 1836, affords very strong evidence to the contrary. There is no evidence in the record to show when the entries, " End of volume 1, Book A," and " Beginning of volume 2, Book B," were made ; but the presumption is, that they were made in 1836, at the time the record of deeds in book B was commenced. The circumstance of their being crowded so as to leave no space between the entry of deeds recorded in different books, raises no presumption that the Frye mortgage was not entered until 1840, because if in fact not entered until that time, it could not have been the reason why the entries, " End of volume 1, Book A," and " Beginning of volume 2, Book B," should have been crowded so close together in 1836, the time when, in the absence of all proof, they must be presumed to have been made. If the fact of entering the description of the lands mortgaged to Frye, upon five instead of seven lines, should be regarded as a suspicious circumstance in a case where the deed embraced so long

a description, the suspicion is removed by the fact, that subsequently, and prior to 1840, other instances occur where the description of land is crowded in a similar manner. Hence, if Frye's mortgage was not recorded, as complainants allege, until 1840, it was not the first instance of crowding upon the book.

It appears from the record, that the deeds, including the mortgage to Frye, were all consecutively numbered upon the entry book, and that circumstance affords strong evidence that it was entered at the time it purports to have been. It is almost inconceivable to suppose that Frye, in 1836, when there could have been no object for so doing, should have left a number vacant, and a space where he could enter his mortgage in 1840, and also another number and space for the deed which follows it. It is true, that there is no evidence to show when the numbering was done, but the presumption is, that it was done at the time the entries were made; and if it was not done then, it was incumbent on the complainants to show that fact. They who would allege that the numbering was done improperly, or at a wrong time, must be required to prove their allegation. This the complainants have wholly failed to do. The fact that a number of deeds, both before and subsequent to the mortgage, appear to have been numbered at the same time, is entirely consistent with what the record ought to show, as some thirty odd deeds were entered of record the same day.

The recording of a mortgage twice, is an unusual, and, unexplained, a suspicious circumstance. The reason for this, as given by Frye in his answer, is, that Shaw, in 1840, applied to him to release the mortgage upon part of the property included in it, so that he might mortgage it to the Bank of Illinois, from which he wanted to borrow money, and that upon his, Frye's, refusing to give such release, Shaw became excited, and threatened to destroy his house and all the records, so that no trace of the mortgage could ever be found; and Frye fearing he would attempt to carry his threats into execution, concluded, as a matter of precaution, to copy the record of the mortgage from book A to book B; and to have one of the books at the court-house, and keep the other at his residence, so that if Shaw should destroy the record of the mortgage in one book, it would be preserved in the other. The threats of Shaw, as stated in the answer, are sworn to by C. C. Forest, a witness examined by Frye;

but still the explanation is not altogether satisfactory, as there was no necessity for recording the mortgage twice. The original might have been deposited in a place where it could be made available in case of a destruction of the record. The circumstance, however, is not sufficient to destroy the record of a deed which otherwise appears to have been properly recorded in 1836. It appears from the decree, that the color of the ink used in making the entry of the mortgage in the entry book, was darker than what had been used in making previous entries. It may have been of the same color as all subsequent entries, so far as the evidence shows, but whether so or not, the circumstance is of too trivial a character to be gravely considered; particularly when we consider that a number of witnesses, including the recorder and clerk of the Circuit Court, who carefully inspected and examined the record, state that they saw nothing out of place, irregular or different in the recording of the mortgage to Frye, from the balance of the record, and no witness contradicts their testimony.

After carefully considering the appearance of the books in the recorder's office, as certified to in the decree, the testimony relating to the appearance of the records, and the allegations of the parties, we are clearly satisfied that there is nothing in the manner of recording the mortgage to Frye, in 1836, and of entering it in the entry book, calculated to show that it was not properly recorded at that time.

Is there any thing outside of the books to show that the mortgage was not recorded at the time it purports to have been? Upon this point the parties have taken much testimony. Upon the part of the complainants, several witnesses, who either had purchased or were about to purchase small portions of the land included in the mortgage to Frye, between 1836 and 1840, testify that Frye told them that there was no mortgage or incumbrance upon the lands they were about purchasing. These statements are proven to have been made at different times, between 1836 and 1840. One witness testifies that Frye not only told him that there was no incumbrance upon a tract of land which is included in his mortgage, but that he examined the record and found none. Whether the declarations of Frye, as proved by persons who had purchased part of the lands included in his mortgage between the years 1836 and 1840, would

48

of themselves be sufficient to warrant the conclusion as against the record, that the mortgage was not recorded till 1840, is a question not necessary to be determined. It is always dangerous to rely solely upon the statements of parties as detailed by witnesses after a lapse of several years, and especially is it so, when the statements are proved by witnesses who, although not legally disqualified from testifying, are yet interested in the question to be decided. But in this case there is quite as much testimony *dehors* the books in the recorder's office to show that the mortgage was recorded prior to 1840, as there is to show that it was not. One witness, William Terry, testifies that he was informed by Shaw, between 1836 and 1840, at different times, that he owed Frye three or four thousand dollars, and that it was secured by mortgage. These statements of Shaw, made at that time, and against his interest, are admissible in evidence, and entitled to the same consideration as the statements of Frye made at the same time. Other witnesses testify to similar statements of Shaw. Terry also swears that he purchased a lot of Shaw in 1838, which was, as he learned, included in the mortgage to Frye, and he refused to receive a deed therefor, unless Frye would release it from his mortgage, which he did, by writing a release upon the deed. The deed, with the release upon it, bearing date March 29, 1839, is made an exhibit in the cause. The mortgage is referred to in the release, and its date and the date of the recording given. Another witness, Hugh McDennet, testifies to having seen and read the mortgage upon the records in the recorder's office in 1837 ; also that he saw the original mortgage at that time, and he enters into a detailed statement, showing the particular circumstances under which he saw the mortgage, and how it happened that he did see it. The complainants made an unsuccessful attempt to impeach the general credibility of this witness, and with that view offered evidence of particular facts, and of his general reputation, in other respects than for truth and veracity. All evidence of such a character is improper, and should be rejected. The authorities are uniform that it is only the general reputation of a witness that can be inquired into, for the purpose of impeaching his testimony; and although there is some conflict in the decisions, as to whether the inquiry should be confined to the general character of the witness for truth and veracity, we think the better

rule is, that it should be so confined. The proper question to be put to a witness called to impeach another is, whether he knows the general reputation of the person sought to be impeached among his neighbors, for truth and veracity. If this question be answered affirmatively, the witness may then be inquired of as to what that reputation is, and whether from that reputation he would believe him on oath. Mobley *vs.* Hamit, 1 A. K. Marsh., 589; The People *vs.* Ruter, 19 Wend., 578; The United States *vs.* Van Sickle, 2 McLean, 219; Ford *vs.* Ford, 7 Humphrey, 100; The People *vs.* Mather, 4 Wend., 257; 1 Starkie on Ev., 182; 11 Met., 538. Only one witness testified that the general reputation of McDennet for truth and veracity was bad, and that he would not believe him on oath; while a host of witnesses, who knew him and his reputation well, testified that his character for truth and veracity was good, and that he was to be believed when testifying as a witness. His statements are therefore entitled to credit.

Independent of the regular acknowledgment of the mortgage in 1836, and its entry upon the recorder's books in that year, there is more evidence in the record to show that the mortgage was executed and recorded in 1836, than there is to show the contrary. The declarations of Frye, prior to 1840, if he ever made them, that there was no incumbrance upon particular pieces of the land which Shaw sold, and which were included in his mortgage, may, perhaps, be accounted for from the fact that Shaw was at that time in extensive business, and probably did not wish it to be known that his property was incumbered. Frye, in making the statements, was running no risk, as his security was ample, and the tracts Shaw was selling were small and unimportant, as compared with all the land included in the mortgage. Moreover, it is not improbable that the money received from the sales, may have been going to Frye, to be applied upon the mortgage. The sales were chiefly of town lots, the sale and improvement of which were calculated to enhance the value of the surrounding property.

Frye's declarations would certainly operate as a release of the mortgage to those who purchased of Shaw upon their faith, and supposing that they were getting a good title, but they are insufficient in view of the positive evidence contained in the record, wholly to set aside the mortgage.

A question is made about the sufficiency of the consideration of the mortgage to Frye, and upon this point much testimony has also been taken. It is clearly proven that Frye was a man of property, that he had had frequent dealings with Shaw, reaching back for near twenty years prior to 1840 ; that Shaw repeatedly acknowledged, prior to that time, that he was largely indebted to Frye ; that he had been known at various times to get money from him, and from others on his order ; and all these facts, together with the note and mortgage, certainly furnish a *prima facie* presumption that the consideration was what it purports to be, and what is there to impeach this *prima facie* case ? Simply the testimony of Hemphill, as to the declarations of Frye made in 1845, that Shaw did not owe him, Frye, so very much, or the insurance companies either ; and that he gave the witness to understand that his claim was a mere shadow, to keep others from getting the land. The statement of a single witness as to his understanding of what Frye said, cannot be permitted to overturn a mortgage, the consideration of which is otherwise unimpeached, and fortified as this is, by many extraneous circumstances and the repeated declarations and admissions of Shaw, made at a time anterior to the existence of the debts to Atchison and the insurance companies, and when it was against his interest to make them. It has been urged in argument that Frye practised a fraud upon the Bank of Illinois, by giving Shaw a certificate that there were no judgments against him in Calhoun county, or elsewhere, as far as he knew; which certificate Frye signed as clerk of the Circuit Court, and which Shaw took with him to the Bank of Illinois when he went to make the loan, which he afterwards effected. So far from this certificate imposing upon the officers of the bank, it ought at once to have aroused their suspicions, and to have led them to suspect that Shaw's lands were not free from incumbrance. Why not procure a certificate from the recorder as well as the clerk, if the lands were unincumbered, was a question which the officers of the bank naturally would, and no doubt did ask, for Shaw went before a justice of the peace and made oath before he could get the money, that his lands were free from any incumbrance created by him.

Although satisfied from the whole record, that the mortgage to Frye was made and recorded in 1836, and that it was given

for the consideration therein expressed, still the complainants are entitled to partial relief. One of the tracts of land contained in the mortgage to the bank, is not included in Frye's mortgage, and as to that, the assignees of the bank are entitled to a foreclosure of the bank mortgage. One other tract included in the mortgage to Frye, was not sold upon the foreclosure of his mortgage, and as to that, also, the assignees of the bank are entitled to a foreclosure, unless it should become necessary hereafter to sell the same, in satisfaction of the mortgage to Frye, in consequence of the foreclosure of his mortgage being partially set aside as hereinafter stated.

Frye, with his answer, sets forth an account of the dealings between Shaw and himself, from the time the mortgage was executed, in 1836, up to January 1, 1840, when the note secured by said mortgage fell due ; from which it appears, that various payments were made, and new loans obtained by Shaw, after the giving of the mortgage; so that, at the time the mortgage to Atchison and the insurance companies was put upon record, June 15, 1839, there was only due upon the mortgage to Frye, $2,577, principal and interest together; but Frye subsequently made advances to Shaw, so that on the 1st of January, 1840, there was due of principal and interest, the precise sum of $3,400 ; to secure which the mortgage had originally been given.

Whatever sums were advanced by Frye, after he had notice of the mortgage to Atchison and others, was in fraud of their rights ; and to that amount his mortgage ought to be postponed to theirs. A subsequent mortgage upon the same premises for an existing debt, is entitled to precedence of advances made by a prior mortgagee, with notice of the second mortgage. Frye recorded the mortgage to Atchison and the insurance companies, and, consequently, had actual notice of its existence, and he was acting contrary to good faith in afterwards increasing his lien to their prejudice, upon the same property embraced in their mortgage. Spader *vs.* Lawler, 17 Ohio, 370 ; 4 Kent, 175; Hughes *vs.* Worley, 1 Bibb, 200 ; Lowthian *vs.* Hasel, 3 Brown Ch. Rep., 162.

The complainants, Atchison and the Missouri Insurance Company, not being parties to the suit in which the mortgage to Frye was foreclosed, are not bound by the decree in that case ; and their proper course, under ordinary circumstances, would

have been, to file a bill to redeem; which they may still do, upon the terms hereinafter indicated; but as the lands sold at the instance of Frye brought two-thirds of their appraised value, which may be regarded as a fair price, unless such bill to redeem is filed as hereinafter provided, a decree will be directed to be entered under the peculiar circumstances of this case, so as not to disturb the sale of said lands already made, under the decree of foreclosure upon Frye's mortgage in case he will pay to Atchison and the Missouri Insurance Company, to be divided between them in proportion to the amount of their respective claims, the sum of nine hundred and thirty-nine dollars, with interest thereon from the 23d of November, 1842, to the time of payment—$939 being the amount after paying costs, which was realized from the sale under the Frye mortgage, over and above what was due Frye, when the sale was made, on account of indebtedness existing at the time he received notice of the mortgage to Atchison and the insurance companies. If Frye fails to pay the sum of nine hundred and thirty-nine dollars, with interest as above specified, within thirty days from the entry of the decree by the Circuit Court upon the remanding of this cause, then the sale made under the Frye mortgage should be set aside, so far as it relates to any of the lands mortgaged to Atchison and the Missouri Insurance Company, and the lands embraced in that mortgage subjected to a resale. The proceeds thereof to be applied, first to the discharge of the amount due Frye on account of the indebtedness secured by his mortgage, which existed prior to June 15, 1839, after deducting from such indebtedness the amount realized from the sale of the other lands included in his mortgage: that is to say, that seven hundred and eighteen dollars, with interest thereon from November 23, 1842, be first paid to said Frye, out of the proceeds of said resale, and the balance of the proceeds applied, as far as it will go, in discharge of the indebtedness to Atchison and the Missouri Insurance Company, in proportion to the amount of their respective claims. The complainants, Atchison and the Missouri Insurance Company, in case of a resale, will be entitled to a correction of the mistake in the description of one of the tracts of land contained in their mortgage, and also to have the quit claim deed from Shaw to Frye, of his tax title, as well as the tax deed from the collector to Frye, set aside, so far as

they relate to the lands to be resold. It would be inequitable to allow Shaw, after mortgaging the lands, to suffer them to be sold for taxes, and by buying them in himself defeat the lien of the mortgage. His purchase of the lands at a tax sale, under such circumstances, must be regarded in the light of a payment of the taxes by him. Douglas *vs*. Dangerfield, 10 Ohio, 152. Frye, who purchased from Shaw with a full knowledge of all the facts, stands in no better position than would Shaw himself.

It will be proper to direct the execution of another deed from Frye to Smith in the place of the one which was cancelled under the decree of the Circuit Court, which was afterwards reversed, upon Smith refunding to Frye the amount of money and interest which was received from him under the erroneous decree.

In case no resale takes place, Frye will be entitled to all the rents and profits derived from the lands in controversy during the pendency of this suit, and the complainants should be required to refund the several sums which may have been paid them by any of the receivers in the case. But if Frye suffers the lands included in the mortgage to Atchison and the insurance companies to be resold, then the rents and profits derived from those lands should be added to the proceeds of the sale to be distributed as heretofore directed.

If the complainants, Atchison and the Missouri Insurance Company, shall, to the next term of the Circuit Court of Calhoun county, exhibit their bill to redeem from the sale of the lands mortgaged to them, and sold at the instance of Frye, on the 23d of November, 1842, for $1,657 32, then they shall have the right to redeem from such sale, upon the principles recognized in this opinion, and the decree hereinbefore directed to be entered, will be so changed as not to interfere with such redemption; but if they do not so exhibit their bill to redeem, then the decree directed in this opinion, is to be executed and to be conclusive of the rights of the parties.

The decree of the Circuit Court is reversed, and the cause remanded, with directions to that Court to enter a decree in conformity to this opinion, and to take such other and further steps as the justice and equity of the case may require, and as may become necessary to carry the decree entered into execution.

The costs in this Court and the Court below will be divided equally between the parties. *Decree reversed.*