## NUGENT *vs.* THE STATE.

1. An inferior court, within the meaning of the first section of the fifth article of the Constitution, is a court whose judgments or decrees can be reviewed on appeal or writ of error by a higher tribunal, whether that tribunal be the Circuit, or Supreme Court.

2. The judgments of the City Court of Mobile being subject to the revision of the Supreme Court, in the same manner that those of the Circuit Courts are, the act creating it does not violate any provision of the Constitution.

3. Where the parts of a child, upon whom an attempt to carnally know her is proven by her to have been made, are shown to be bruised and infected with the venereal disease, proof of sexual intercourse between her and other persons, before and near the time of the commission of the alleged offence, is admissible, as tending to weaken the corroborative force of these circumstances.

4. The credit of a witness cannot be impeached by showing particular acts of immorality, disconnected with the question of veracity.

5. Where there is evidence conducing to show that a prisoner, charged with an assault with intent to commit a rape, was at the time in a greatly debilitated condition from a previous debauch, it is a circumstance, however light, to be considered by the jury in ascertaining whether he was physically capable of committing the offence.

ERROR to the City Court of Mobile. Tried before the Hon. Alex. McKinstry.

The prisoner was indicted in the City Court of Mobile for the abuse of one Hannah Smith, a child under ten years of age, in an attempt to carnally know her. It appeared by the testimony offered on the part of the prosecution that the child's private parts were inflamed, which one physician testified arose from pressure and bruising, but another from a venereal disease. The prisoner's counsel offered to prove particular acts of carnal intercourse between said Hannah Smith and other persons before and near the time the offence was charged to have been committed. The court enquired, whether the persons were diseased, and being informed by the prisoner's counsel that he had no evidence on that point, excluded the testimony. There was evidence to show that the prisoner was not diseased. The State examined as a witness the mother of the child, and the prisoner

offered to prove particular acts of prostitution committed by her within the past six months, for the purpose of discrediting her, but the court refused to allow the testimony to be given. It appeared by the evidence that for several days before the time when the offence was charged to have been committed, the prisoner had been in a state of intoxication. The degree of the intoxication was variously stated—some of the witnesses saying that he could not walk or walk steadily—others that he could go in and out of his room and did so. The court instructed the jury to disregard entirely this evidence, unless he was so drunk as to be physically unable to commit the offence. To the rulings of the court in the exclusion of the evidence offered, and to the charge given, the prisoner excepted and now assigns it as error.

CAMPBELL, for the prisoner:

1. The evidence offered in regard to the conduct of Hannah Smith, was admissible. The injury was proven by an examination of the person by physicians, of testimony offered of the result of that examination. The evidence tended to the conclusion that there were causes in existence adequate to the injuries shown.—1 Russel on Crimes, §§ 562-3.

2. The same evidence was admissible to show that there had been no such moral training as to entitle her to credit in a court of justice. The character of a child cannot be ascertained as that of an adult. The want of a moral character is to be infered from fewer instances of delinquency, and by proof of the condition in which she was placed. The inquiry must proceed at once into the circumstances by which she was placed, and the effect of those circumstances as shown by her conduct.—1 Dennio, 19; 3 Kelly, 317; 3 Hill, 309.

3. The court is not a constitutional court. This is not an inferior court in the sense of the constitution.—6 Howard, S. C. 40; Viner's Abr. Courts; 3 Peters, 204; 5 Cranch, 185; 2 Scam. 269; 3 Metc. 460; Bac. Abr. Courts; 2 Barb. S. C. Rep. 282; 13 Ohio, 176.

4. The Circuit Court has no revisory power over the Criminal Court. The statutes do not apply to the Criminal Court, cited by the prosecution. The courts, Circuit and Criminal, are courts of concurrent jurisdiction, and the same statutes that

confer an authority or jurisdiction of criminal matters, are held to apply to the latter court. The Criminal Court has a supervisory jurisdiction in criminal matters, co-extensive with that of of the Circuit Court, under this statute. This court is independent of the Circuit Court.—3 Metc. 460; 2 Stew. & Port. 9; 1 Metc. & Perk. 630, § 61. The statutes will be found in acts of 1846, p. 29, and of 1850, 24, § 29.

ATTORNEY GENERAL and GIBBONS, for the State.

DARGAN, C. J.—1. 2. By the act of the 3d February 1846, a court was established in the city of Mobile by the name of the Criminal Court for Mobile county, which was invested with jurisdiction, concurrent with that of the Circuit Courts of the State, in the administration of the criminal law in the county of Mobile, and the judgments of this court were made revisable by the Supreme Court, in the same manner as were the judgments of the Circuit Courts. By the act of the 11th February 1850, the jurisdiction of this court was enlarged, and the same jurisdiction that had been possessed by the respective County Courts, except the jurisdiction relating to matters of probate and administration, was confered upon it. By another act passed at the same session of the Legislature, the name of this court was changed from the Criminal Court for Mobile county, to that of the City Court of Mobile. Neither the act of 1846, nor that of 1850, make any provision, by which the judgments or sentences of this court can be reviewed by the Circuit Court; they can be reviewed, reversed or corrected, only by the Supreme Court. Hence it is contended that the City Court of Mobile is not an *inferior court*, according to the sense of that term as used in the first section of the 5th article of the constitution of this State, and consequently that the court, as organised, is unconstitutional, and the conviction of the prisoner, erroneous and void. The language of the first section of the 5th article of the constitution is as follows: "The judicial power of this State shall be vested in one Supreme Court, Circuit Courts, to be held in each county in the State, and such inferior courts of law and equity, to consist of not more than five members, as the General Assembly may from time to time direct, ordain and establish." Whether the City Court of Mobile is an inferior court, accord-

ing to the meaning of this clause of the constitution, is the question. An inferior court, according to the technical meaning of the term, is one, the judgments of which, standing alone, are mere nullities, and in order to give them validity their proceedings must show their jurisdiction.—Kemp's Lessees v. Kennedy, 5 Cranch 173, 10 Wheat. 192. But all courts, from which an appeal or writ of error lies, are inferior courts in relation to the court before which their judgments may be carried, and by which they may be reviewed, annulled, or affirmed.—*Ex parte* Tobias Watkins, 3 Pet. 205. It is in this latter sense that the framers of our constitution used the words inferior courts. They meant thereby courts, whose judgments could be reviewed, and their errors corrected by another and a higher tribunal. The City Court of Mobile answers this description, for its judgments can be brought before the Supreme Court, in the same manner that the judgments of the Circuit Courts may be, and if found to be erroneous, can be reversed or annulled. The constitution does not designate the court, before which the judgments and decrees of the inferior courts should be brought. It only contemplates that the courts which should be established by the Legislature, besides the Supreme and Circuit Courts, must be inferior courts, that is, that their judgments and decrees must be subject to the revision of a higher tribunal. It, therefore, follows that any court, so organised by the Legislature that its judgments may be reviewed by appeal or writ of error, either to the Supreme or Circuit Court, is an inferior court within the meaning of the constitution. The adjective inferior, as used in this clause of the constitution, is applicable to, and designates the character of all courts the Legislature is constitutionally authorised to establish, as well courts of equity as of law. But we think it would be admitted that the Legislature could rightfully create inferior courts•of equity, without giving the Circuit Courts any supervisory control over them; for the 8th section of the same article of the constitution expressly enables the General Assembly to establish courts of equity with original and appellate jurisdiction, and provides that until the establishment of such courts, the equity jurisdiction should be vested in the circuit judges, and further provides that the judges of the Circuit Courts should have power to issue writs of injunction returnable into the courts of chancery. This clause of the constitution

evidently contemplates that, after the establishment of courts of chancery by the Legislature, the Circuit Courts should have no equity jurisdiction, save only to issue writs of injunction returnable into the Chancery Courts, and we cannot believe that the framers of the constitution intended to give the Circuit Courts a supervisory control over such inferior courts of equity, as the Legislature might see proper to create, and at the same time to take from the Circuit Courts all equity jurisdiction. In providing for the organization of separate courts of chancery, with original and appellate jurisdiction, and thereby divesting the Circuit Courts of all equity jurisdiction, except the authority to grant injunction, it was the manifest intent to deprive the Circuit Courts of all equity jurisdiction after the establishment of courts of chancery, as well supervisory or appellate as original. An inferior court of equity may, therefore, be created by the Legislature, over which the Circuit Courts have no authority or control. Still it would be an inferior court, within the meaning of the first section of the 5th article of the constitution ; an inferior court in the sense, as if it were a court of law, that is, a court, the decrees of which were subject to be reviewed by a higher tribunal. Thus we see that it could not have been intended to subject inferior courts of equity to the appellate jurisdiction of the Circuit Courts, and that a court of equity may be an inferior court within the meaning of the constitution, although its judgments and decrees are without the authority or supervisory control of the Circuit Courts. If an inferior court of equity may be so created, without violating the constitution, an inferior court of law may in like manner, for, in speaking of inferior courts of law and equity, the constitution evidently intends that they should be inferior in the same sense, that is, courts whose judgments and decrees must be liable to the revision of a higher tribunal. The judgments and proceedings of the City Court of Mobile are subject to the revision of the Supreme Court of the State. This makes it an inferior court, within the meaning of the constitution. It is, therefore, a constitutional court, in which the prisoner might be lawfully indicted and convicted.

3. We think the court clearly mistook the law, in refusing to permit the accused to prove that before, and near the time of committing the alleged offence, other persons had carnal knowledge of the girl, upon whom the offence is charged to have been

Nugent v. The State.

committed, inasmuch as the State had previously proved that she was infected with venereal disease, and the parts were bruised and inflamed. The existence of the disease and the injury to her person were facts corroborative of the testimony of the girl, for they tended strongly to show that some one had attempted to have sexual intercourse with her, and it was certainly competent for the prisoner to show that these facts could have existed consistently with his innocence; for such proof would to some extent weaken the presumption of guilt, that would result from the existence of the disease and the injuries to her person. It is true that these acts of sexual intercourse with others might have been rejected, if they had been offered for the mere purpose of discrediting the testimony of the girl, independent of all other evidence. For the rule is well established, that the testimony of a witness cannot be impeached by showing particular acts of immorality, disconnected from the question of veracity. But when the attempt is made to impeach a witness on the ground of bad character, the proper inquiry is, as to his character for truth and veracity. See 2 McLean, 219; The State v. Bruce, 11 Shep. 296; 15 Verm. 435; Barber v. Rose, 18 Wend. 146; Commonwealth v. Morse, 3 Pick. 194; The State v. Jefferson, 6 Iredell, 305; Cow. & Hill's notes to Phil. Ev. § 292. But when particular facts are proved, which raise a presumption against the accused, he may certainly prove any other facts or particular acts that tend to repel or weaken this presumption. The existence of the disease and the bruises on the person of the girl were facts established by other testimony than the testimony of the girl, but in connection with her testimony, they created a strong presumption of the guilt of the prisoner, and to show that this disease and those bruises might have been the result of sexual intercourse with others, to some extent weakened the presumption, and, therefore, was admissible, without any regard to the weight or importance the jury might have attached to it.

4. From what has been said it will appear that the court did not err in rejecting evidence of particular acts of prostitution on the part of the mother of the girl, for the purpose of discrediting the mother as a witness.

5. The testimony tended to show that about the time the offence is alleged to have been committed, the physical system of

the accused was greatly weakened and debilitated from drink. The court instructed the jury to disregard this evidence entirely, unless the prisoner was so drunk as to be incapable of committing the offence. We do not think this instruction was correct. It is true that the drunken condition of the accused would, neither in a moral, nor legal point of view, excuse or palliate the crime, if in fact committed, but drunkenness may not only render one entirely incapable of committing the crime, with which the prisoner is charged, but it may, by the prostration of his system, render him less capable of committing it. The effects, therefore, of the drunken condition of the accused upon his physical capacity to commit the crime, was a matter to be considered by the jury, in coming to their conclusion whether the prisoner did the act with which he is charged. A certain degree of excitement from drink may increase the passions, the cravings of which lead to the commission of such unnatural and monstrous crimes, but drunkenness may be so excessive as to render the party partially or totally incapable of committing it. The evidence tended to show that the prisoner was greatly weakened by drink; this was a circumstance to be considered by the jury, however light they might have esteemed it. The judgment must be reversed, and the cause remanded, that the prisoner may be tried again, but in the mean time, he will be kept in custody until discharged by due course of law.